1  PAUL B. SALVATY - State Bar No. 171507
   psalvaty@glaserweil.com
2  CAMERON M. KALUNIAN - State Bar No. 244418
   ckalunian@glaserweil.com
3  GLASER WEIL FINK JACOBS
     HOWARD AVCHEN & SHAPIRO LLP
4  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
5  Telephone:  (310) 553-3000
   Facsimile:  (310) 556-2920
6
   Attorneys for Plaintiff
7  Westbourne Capital, LLC



FILED
CLERK, U.S. DISTRICT COURT

NOV - 4 2011
2:32

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  Westbourne Capital, LLC,                CASE NO. CV11-9193-GHK
                                            (RZx)
12                  Plaintiff,
                                            COMPLAINT FOR:
13  v.                                      1.  BREACH OF CONTRACT;
                                            2.  CONVERSION;
14  Residential Credit Solutions, Inc.,     3.  BREACH OF THE IMPLIED
                                                COVENANT OF GOOD
15                  Defendant.                  FAITH AND FAIR DEALING;
                                            4.  INTERFERENCE WITH
16                                              CONTRACTUAL
                                                RELATIONS;
17                                          5.  INTENTIONAL
                                                INTERFERENCE WITH
18                                              PROSPECTIVE ECONOMIC
                                                ADVANTAGE; AND
19                                          6.  UNFAIR BUSINESS
                                                PRACTICES UNDER BUS. &
20                                              PROF. CODE § 17200

21                                          **Jury Trial Demanded**

22

23

24      Plaintiff Westbourne Capital, LLC for its Complaint alleges:

25                          **Introduction**

26      1.      Plaintiff Westbourne Capital, LLC ("Westbourne") brings this action

27  against defendant Residential Credit Solutions, Inc. ("RCS") to recover money that

28  RCS has wrongfully converted to its own use and to enjoin RCS from continuing to



COMPLAINT

746712

1  withhold money that belongs to Westbourne and which Westbourne needs to meet its
2  contractual obligations to the entities whose portfolios it manages.

3      2.    Westbourne specializes in acquiring, managing, and liquidating
4  undervalued first mortgage loans.  In January 2011, Westbourne entered into a
5  mortgage servicing contract with RCS ("Servicing Agreement"), a mortgage servicing
6  company that focuses on credit-sensitive residential mortgage loans.  Under the terms
7  of the Servicing Agreement, RCS agreed to provide management and disposition
8  services for mortgage loans owned by Westbourne, including but not limited to
9  collecting payments made under each of the mortgages identified in the contract and
10  remitting those payments to Westbourne after making certain specific deductions for
11  services rendered by RCS.

12      3.    After a dispute arose between Westbourne and RCS concerning certain
13  of the deductions taken by RCS under the Servicing Agreement, RCS purported to
14  terminate the Servicing Agreement.  RCS informed Westbourne that, pending transfer
15  of servicing responsibilities to a new servicer, it would retain possession of all money
16  paid to RCS in connection with the mortgages owned by Westbourne and would not
17  remit to Westbourne any of the funds that it has collected and is continuing to collect
18  on Westbourne's behalf.  RCS has no contractual or legal basis for retaining for itself
19  the money that it collects on the mortgages owned by Westbourne, beyond certain
20  specific deductions that are set forth in the parties' contract.  To the contrary, RCS is
21  contractually and legally required to remit all such money to Westbourne.

22      4.    RCS's wrongful conversion of Westbourne's funds constitutes a breach
23  of RCS's contractual obligations and also has impaired Westbourne's ability to meet
24  its own contractual obligations.  Despite repeated demands, RCS has refused to remit
25  the outstanding amounts to Westbourne and has stated that it will continue to
26  withhold such money in the future, notwithstanding the serious harm that its conduct
27  is inflicting upon Westbourne.  Westbourne brings this action to recover all sums that
28  RCS has unlawfully withheld, to enjoin RCS from continuing to withhold

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

1  Westbourne's money and from interfering with Westbourne's contractual and

2  prospective economic relations, and to recover all other appropriate damages to which

3  Westbourne is entitled.

### Jurisdiction and Venue

5        5.     The Court has jurisdiction over the action pursuant to 28 U.S.C. § 11332

6  because plaintiff and defendant are citizens of different states and the amount in

7  controversy exceeds $75,000.

8        6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a

9  substantial part of the acts or omissions giving rise to this action occurred here.

### Identification of the Parties

11       7.     Westbourne is a Utah  limited liability company with its principal place

12  of business located at 100 Wilshire Blvd., Suite 250 Santa Monica, California.

13  Westbourne is engaged in the business of providing  investment management,

14  consulting and advisory services to various entities in connection with acquiring,

15  managing, and liquidating undervalued first mortgage loans. Westbourne assists these

16  entities in advising and managing their investment portfolios by performing such

17  services as default management and loss mitigation, loan servicing, asset evaluation,

18  loan administration, property management, closing services, and cash management.

19  The funds received by Westbourne in connection with these duties are remitted to the

20  entities for repayment to investors.

21       8.     Defendant RCS is a Delaware corporation with its principal place of

22  business located at 4282 North Freeway, Fort Worth, Texas.  RCS is primarily

23  engaged in the business of servicing mortgages and other real property investments.

### General Allegations

*The Servicing Agreement*

26       9.     On or about January 13, 2011, Westbourne and RCS entered into the

27  Servicing Agreement whereby RCS agreed to provide management and disposition

28  services for certain mortgage loans secured by mortgages or deeds of trust on

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

residential real property (the "Mortgage Loans") and certain real properties which have been acquired by foreclosure or similar proceedings (the "REO Properties") owned by Westbourne (collectively, the "Assets").  A true and correct copy of the Servicing Agreement is attached hereto as Exhibit 1 and is incorporated herein by reference.

10.    Under the terms of the Servicing Agreement, RCS agreed to service and administer the Assets according to the "Specified Servicing Practices" prescribed therein.  By way of example, RCS agreed to do the following:

a.    Pursuant to Section 2.04, RCS agreed to procure Life of Loan Tax Contracts ("LOL Contracts") after providing Westbourne with an electronic listing of which properties had existing coverage and which did not, thereby giving Westbourne an opportunity to verify which properties needed LOL Contracts;

b.    Pursuant to Section 3.02,  RCS agreed to collect "all payments due under each of the Assets" and to use commercially reasonable efforts to "foreclose upon, obtain relief from bankruptcy, or otherwise comparably convert the ownership" of Assets in default;

c.    Pursuant to Section 3.03, RCS agreed to "segregate and hold all funds collected and received on the Assets separate and apart from its own funds and general assets" in one or more Custodial Accounts; and

d.    Pursuant to Section 3.11, RCS agreed to obtain hazard insurance and lender paid insurance for each mortgaged property within certain parameters in the event that the property did not meet specified coverage minimums.

11.    Pursuant to Section 3.04, RCS is only permitted to make withdrawals from the Custodial Account for certain specific purposes including, for example, to reimburse itself for servicing advances, expenses, and unpaid servicing fees, to

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

1 | withdraw funds deposited in error, and to clear and terminate the Custodial Account

2 | upon the termination of the Servicing Agreement.

3 |       12.    The Servicing Agreement (in Section 4.01) provides that, once a month,

4 | RCS shall remit to Westbourne, by wire transfer, all immediately available funds and

5 | amounts deposited in the Custodial Account (net of charges against or withdrawals

6 | from the Custodial Account pursuant to Section 3.04).  Per the Servicing Agreement

7 | (in Section 4.02), RCS is required to provide an electronic statement of the monthly

8 | remittance advices.

9 |       13.    Pursuant to the Servicing Agreement, all of the income derived and

10 | collected from the Assets and maintained in the Custodial Account is the property of

11 | Westbourne.  (*See, e.g.* Sections 3.02 and 3.03.)

12 |       14.    Sections 8.01, 8.02 and 8.03 of the Servicing Agreement set forth the

13 | method for terminating the Service Agreement.  Specifically, absent cause, RCS can

14 | only terminate the Servicing Agreement via mutual consent or with sixty (60) days

15 | written notice in the event that the aggregate unpaid principal balance of the

16 | Mortgage Loans decreases to ten percent (10%) or less of the aggregate unpaid

17 | principal balance of the Mortgage Loans at the time of RCS's initial servicing of the

18 | Assets.

19 |       15.    The Servicing Agreement also specifies that RCS must indemnify

20 | Westbourne for damages incurred as a result of RCS's breaches of the Servicing

21 | Agreement.  Section 6.04 of the Servicing Agreement provides that RCS will hold

22 | Westbourne "harmless against any and all claims, losses, damages, liabilities,

23 | penalties, fines, forfeiture, reasonable legal fees and related costs, judgments and any

24 | other costs, fees and expenses that [Westbourne] may sustain in any way related to

25 | the breach of [RCS's] representations and warranties as set forth in [the Service

26 | Agreement] or the failure of [RCS] to perform its duties in strict compliance with [the

27 | Servicing Agreement]."

28 | ///

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

16.    In agreeing to have RCS service its Assets, Westbourne relied on RCS's agreement to provide the services pursuant to the "Specified Service Practices" and to make timely remittance of all funds collected and received from the Assets on Westbourne's behalf.  If RCS had not agreed to provide such services under the terms set forth in the Servicing Agreement and as described above, Westbourne would not have contracted with RCS to service such Assets.

### *RCS's Breaches and Torts*

17.    In approximately July 2011, Westbourne identified several issues relating to RCS's services that caused Westbourne concern and that Westbourne attempted to address through discussions with RCS personnel.  As part of these discussions, in an email dated August 8, 2011, RCS advised Westbourne that Westbourne should "hold any payments until [RCS] can determine the total amount due [pursuant to the Servicing Agreement]."  A true and correct copy of the August 8, 2011 email is attached hereto as Exhibit 2 and is incorporated herein by reference.

18.    On or about July 5, 2011, Westbourne notified RCS that it believed that RCS was not insuring the Assets within the parameters specified in Section 3.11 of the Servicing Agreement.  RCS initially responded that it would consider Westbourne's concerns and provide a response.  After many weeks of delay, on or about September 28, 2011, RCS agreed that, in conjunction with its insurer, RCS would cancel the excessive policies from their effective dates of coverage and credit funds back to Westbourne.  To date, RCS has failed to cancel the policies or credit funds back to Westbourne as promised.

19.    On or about July 19, 2011, Westbourne notified RCS that RCS had erroneously placed LOL Contracts on Assets in violation of Section 2.04 of the Servicing Agreement.  Although RCS initially responded that the LOL Contracts had been placed prior to receiving notice from Westbourne rejecting such placement, Westbourne had in fact provided RCS with timely "rejection notices" pursuant to the terms of the Servicing Agreement.  By ignoring Westbourne's rejection notices and

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

1   by not following its own procedures set forth in Section 2.04 requiring RCS to

2   provide Westbourne with an electronic file showing whether each Asset was or was

3   not covered by a transferable LOL Contract, RCS incurred thousands of dollars in

4   unnecessary and inappropriate insurance premiums that it then attempted to pass on to

5   Westbourne.  Despite its clear violation of the terms of the Servicing Agreement, on

6   or about September 16, 2011, RCS stated that it would not credit any funds back to

7   Westbourne flowing from its breach.

8        20.    On or about July 21, 2011, Westbourne notified RCS that the REO

9   Properties Base Servicing Fee being charged by RCS was excessive.  RCS initially

10   responded that it would consider Westbourne's concerns and provide a response.

11   While purportedly considering its response, RCS charged Westbourne another

12   month's worth of excessive servicing fees.  After many weeks of delay, on or about

13   September 16, 2011, RCS responded that it would not lower its fees or credit any

14   funds back to Westbourne.  If RCS had notified Westbourne of its decision in a timely

15   manner, then Westbourne would have deboarded the REO Properties in time to avoid

16   another month's worth of fees (which is precisely what Westbourne did after RCS

17   belatedly notified Westbourne of its position).

18        21.    Despite Westbourne's extensive efforts to address RCS's breaches and

19   reach a resolution among the contracting parties, on or around October 7, 2011, RCS

20   purported unilaterally to terminate the Servicing Agreement in violation of Sections

21   8.01, 8.02, and 8.03 of the Servicing Agreement.

22        22.    Even worse, RCS is now refusing to remit to Westbourne any of the

23   money that it has collected and is continuing to collect on Westbourne's behalf.  By

24   letter dated October 14, 2011, RCS notified Westbourne that, because RCS is

25   obligated to continue servicing Westbourne's assets until servicing responsibilities are

26   transferred to another servicer, RCS would withhold all current and future remittance

27   payments pending transfer of servicing responsibilities to another servicer.  In

28   accordance with these threats, RCS has withheld from Westbourne all amounts that

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

1  were due to be remitted by RCS to Westbourne on or about October 7, 2011, and
2  Westbourne has stated that it plans to withhold all amounts that are due to be remitted
3  by RCS to Westbourne on or about November 7, 2011, pursuant to both the definition
4  of "Remittance Date" as set forth in the Servicing Agreement and Section 4.01 of the
5  Servicing Agreement.  RCS has no legal or contractual basis for withholding these
6  remittances from Westbourne, as the funds to be remitted are the property of
7  Westbourne.

8      23.    Further, RCS failed to provide Westbourne with the electronic statement
9  of the monthly remittance advices as required by the Servicing Agreement.

10      24.    By letters dated September 8, 2011 and October 20, 2011, Westbourne
11  demanded that RCS cease its improper withholding of funds and immediately remit
12  payment of the amounts to which Westbourne is entitled under the Servicing
13  Agreement.

14      25.    As of the filing of this Complaint, RCS has failed to provide any
15  response to Westbourne's October 20, 2011 letter.

16      26.    As of October 12, 2011, RCS has failed to remit to Westbourne any of
17  the amounts that should have been remitted for September 2011, which amounts total
18  $215,326.81, including $808.12 in interest.

19  **First Cause of Action**
20  (Breach of Servicing Agreement)

21      27.    Westbourne realleges and incorporates by reference each and every
22  allegation contained in paragraphs 1 through 26 of this Complaint as though fully set
23  forth herein.

24      28.    Westbourne and RCS entered into the Servicing Agreement, a binding
25  contract in which RCS agreed, upon certain conditions being met and which have
26  been met, to provide management and disposition services pursuant to the terms of
27  the Servicing Agreement.  In connection with the Servicing Agreement, Westbourne
28  agreed to pay RCS a base servicing fee and to reimburse RCS for advanced costs.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

1   RCS agreed to hold all income collected from the Assets in trust according to the

2   terms of the Servicing Agreement.

3       29.    Westbourne has substantially performed its obligations under the

4   Servicing Agreement, except to the extent that such performance was waived,

5   excused, or prevented by reason of the acts and omissions of RCS.

6       30.    By engaging in the conduct described herein, RCS breached its

7   obligations under the Servicing Agreement including but not limited to its obligations

8   under Sections 2.04, 3.02, 3.03, 3.11, 4.01, 8.01, 8.02, and 8.03 of the Servicing

9   Agreement.  Among other things, as alleged above, RCS is currently withholding and

10   refusing to remit to Westbourne amounts that that have been collected by RCS on

11   Westbourne's behalf and for Westbourne's benefit and held in trust for Westbourne

12   under the terms of the Servicing Agreement.

13       31.    As a proximate result of RCS's breaches of the Servicing Agreement

14   alleged herein, RCS has suffered actual damages in an amount to be proven at trial.

15       32.    As a proximate result of RCS's breaches of the Servicing Agreement

16   alleged herein, Westbourne has been compelled to incur attorney's fees and costs in

17   order to enforce its rights under the Servicing Agreement.  Accordingly, under the

18   Servicing Agreement, Westbourne also seeks an award of reasonable attorney's fees

19   and costs in an amount to be proven at trial.

20       33.    Westbourne has provided written notice to RCS that it was in breach of

21   the Servicing Agreement and has demanded immediate payment of the full amount

22   owed to Westbourne thereunder.

23       34.    By reason of RCS's breaches of the Servicing Agreement, its

24   withholding of Westbourne's money, and its failure to pay all amounts due,

25   Westbourne has been damaged by RCS and is entitled to judgment against RCS as set

26   forth more fully below.

27   ///

28   ///

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

## Second Cause of Action

(Conversion)

35.     Westbourne realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36.     Pursuant to the Servicing Agreement, RCS was contractually required to prepare, preserve and maintain a separate Custodial Account for the proceeds collected by RCS from Westbourne's Assets.

37.     Following Westbourne's discovery of RCS's actions, as described hereinabove, Westbourne demanded that the monthly remittance of the amounts held in the Custodial Account for the benefit of Westbourne be turned over to Westbourne. RCS has failed and refused, and continues to refuse, to remit the funds within the Custodial Account that are owned by and vested in Westbourne.

38.     As a result of its actions, RCS has wrongfully retained possession, control and dominion over Custodial Account funds obtained in connection with the servicing of the Assets to which Westbourne had and has an immediate right to possess.

39.     RCS has unlawfully and without authorization assumed and exercised dominion and control over such property to the exclusion of, or inconsistent with, Westbourne's rights to such funds as an owner.

40.     RCS does not have any right or lawful interest in those misappropriated funds.

41.     Westbourne made a demand to RCS for the immediate return of the misappropriated funds, but such demand has been refused.

42.     The amount of the misappropriated funds is readily identifiable and ascertainable.

43.     The actions of RCS are unauthorized, depriving Westbourne of the funds to which it is entitled and for which it is responsible, constituting conversion.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

44.     The conduct of RCS set forth above was malicious, willful and oppressive, and was engaged in with the intent to cause injury to Westbourne and deprive Westbourne of its rightful property.  Westbourne therefore is entitled to an award of punitive damages in an amount to be proven at trial.

### Third Cause of Action

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

45.     Westbourne realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46.     Implied in every contract is a covenant of good faith and fair dealing that neither party will engage in any act or omission that is intended or has the natural tendency to deprive the other party of the full benefits of the other party's bargain. This covenant is implied in the Servicing Agreement and imposes upon RCS a duty not to engage in any acts or omissions that would frustrate the enjoyment of Westbourne of any of the rights and benefits owed under the Servicing Agreement.

47.     By virtue of the contractual relationship between the parties, Westbourne placed trust and confidence in RCS to perform all of the duties and obligations owed under the terms of the Servicing Agreement and the implied covenant inherent in the Servicing Agreement and not to take any action which would unduly or unreasonably impair or harm any rights or benefits owed or reasonably to be expected under the Servicing Agreement.

48.     RCS has breached the implied covenant of good faith and fair dealing and denied Westbourne the rights and benefits to which it was entitled and reasonably expected under the terms of the Servicing Agreement by engaging in the conduct described herein.  RCS pursued this course of conduct in bad faith and with the intent to interfere with, injure and frustrate the enjoyment of the benefits and rights conferred upon or reasonably to be expected by Westbourne pursuant to the terms of the Servicing Agreement.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

49.     The conduct of RCS as alleged herein has unfairly frustrated the purposes of the Servicing Agreement and has disappointed Westbourne's reasonable expectations thereunder.

50.     As a direct and proximate result of RCS's material breaches of the covenant of good faith and fair dealing, Westbourne has been damaged in an amount to be proven at trial.

51.     In committing the acts described herein, RCS acted in conscious disregard of the rights of Westbourne.  The conduct of RCS set forth above was malicious, willful and oppressive, and was engaged in with the intent to cause injury to Westbourne.  Westbourne therefore is entitled to an award of punitive damages in an amount to be proven at trial.

## Fourth Cause of Action

### (Interference with Contractual Relations)

52.     Westbourne realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.     Westbourne has entered into various management, consulting, and advisory agreements with various entities ("Management Agreements") which constitute valid and binding contracts.  Pursuant to the terms of the Management Agreements, Westbourne is obligated to make payments to the entities whose portfolios it manages for payment to investors of funds derived from the investment of the investor capital.

54.     Westbourne is informed and believes, and on that basis alleges, that RCS knew of the Management Agreements because, among other things, Westbourne has notified RCS of its contractual obligations to the investors.  RCS is also aware that Westbourne relies on the income derived from the Assets to pay the entities whose portfolios it manages in accordance with the Management Agreements.

///

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

55.     As discussed above, RCS willfully and intentionally failed to remit to Westbourne the income derived from the servicing of the Assets, thereby intentionally depriving Westbourne of its property and impairing Westbourne's ability to meet its contractual obligations.

56.     Westbourne is informed and believes, and on that basis alleges, that the conduct of RCS set forth above was intended to interfere with Westbourne's ability to fulfill its management duties and to induce Westbourne to breach the various Management Agreements.

57.     As a direct and proximate result of RCS's conduct, Westbourne has been unable to fulfill its management duties in accordance with the terms of the Management Agreements and its contractual relationship with the entities whose portfolios it manages has been disrupted.

58.     These disruptions have proximately caused Westbourne to suffer damages in an amount that will be proved at trial.

59.     The conduct of RCS set forth above was malicious, willful and oppressive, and was engaged in with the intent to cause injury to Westbourne. Westbourne therefore is entitled to an award of punitive damages in an amount to be proven at trial.

**Fifth Cause of Action**

(Intentional Interference with Prospective Economic Advantage )

60.     Westbourne realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61.     Westbourne is engaged in the business of providing  investment management, consulting and advisory services to various entities in connection with the acquisition, management and liquidation of first mortgage loans which are financed by third-party investor capital.

///

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

62.     Westbourne has an economic relationship with the various entities whose portfolios it manages as Westbourne's duties include default management and loss mitigation, loan servicing, asset evaluation, loan administration, property management, closing services and cash management for the Assets identified in the Servicing Agreement. The funds received by Westbourne in connection with these duties are remitted to the entities it manages for repayment to investors.

63.     Westbourne is informed and believes, and on that basis alleges, that RCS is aware of the economic relationship between Westbourne and the entities whose portfolios it manages.

64.     Westbourne is informed and believes, and on that basis alleges, that RCS knew or reasonably should have known that Westbourne relied on the income derived from the Assets to pay the entities whose portfolios it manages.

65.     As alleged above, RCS willfully and intentionally failed to remit the income derived from the Assets, thereby intentionally depriving Westbourne of its property and its ability to meet its obligations to the entities whose portfolios it manages.

66.     Westbourne is informed and believes, and on that basis alleges, that the conduct of RCS set forth above was intended to impair and disrupt Westbourne's business relations with the entities whose portfolios it manages.

67.     As a direct and proximate result of RCS's conduct, Westbourne's prospective economic relationship with the various entities whose portfolios it manages has been disrupted.

68.     These disruptions have proximately caused Westbourne to suffer damages in an amount that will be proven at trial.

69.     The conduct of RCS set forth above was malicious, willful and oppressive, and was engaged in with the intent to cause injury to Westbourne. Westbourne therefore is entitled to an award of punitive damages in an amount to be proven at trial.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

1

### Sixth Cause of Action

2   (Unfair Business Practices Under California Business and Professions Code §17200)

3           70.     Westbourne realleges and incorporates by reference each and every

4   allegation contained in paragraphs 1 through 69 of this Complaint as though fully set

5   forth herein.

6           71.     By engaging in the conduct described herein, RCS has engaged in a

7   series of unfair and unlawful business acts and practices prohibited by Bus. & Prof.

8   Code § 17200 with respect to their dealings with and concerning Westbourne.

9   Specifically, as described above, RCS engaged in an unfair, unlawful and fraudulent

10  scheme whereby RCS misappropriated Westbourne's funds for its own benefit,

11  intentionally interfered with Westbourne's contractual relations and otherwise

12  interfered with Westbourne's ongoing business activities.

13          72.     RCS's conduct constitutes an unfair, unlawful and fraudulent business

14  act or practice under Business & Professions Code §§17200 *et seq.*, in that such

15  conduct has inflicted and continues to inflict harm upon Westbourne, such conduct is

16  without any legitimate business justification, and such conduct offends established

17  public policy and is immoral, unethical, oppressive, unscrupulous, and substantially

18  injurious to Westbourne and to the People of the State of California.  RCS's conduct

19  also constitutes an unlawful business act or practice in that it constitutes interference

20  with contractual relations, conversion and interference with prospective business

21  advantage. The harm to Westbourne caused by RCS's conduct far outweighs any

22  alleged benefits that Defendants might claim.

23          73.     As a result of RCS's unfair, unlawful and fraudulent business practices,

24  RCS unlawfully has acquired money or property owned by Westbourne.  Westbourne

25  has both an ownership interest and a vested interest in this money or property.  These

26  sums rightfully belong to and are owned by Westbourne and, but for RCS's

27  wrongdoing, they would be in the possession of Westbourne.  Westbourne requests

28  restitution of all money obtained by RCS through their violations of Sections 17200 *et*

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  *seq.*,  including but not limited to disgorgement of the amounts RCS has withheld

2  through its unlawful and unfair conduct and of the amounts RCS has wrongfully

3  charged Westbourne under the Servicing Agreement.

4  **Prayer for Relief**

5      WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment

6  in its favor and grant the following relief:

7  **On the First Cause of Action:**

8      1.    For compensatory damages in an amount according to proof at trial, but

9  in an amount in excess of $75,000.00, including contractual interest;

10      2.    Pre and post-judgment interest;

11  **On the Second Cause of Action:**

12      3.    For compensatory damages in an amount according to proof at trial, but

13  in an amount in excess of $75,000.00;

14      4.    For punitive or exemplary damages in an amount sufficient to punish

15  RCS and deter RCS and others from engaging in similar conduct;

16  **On the Third Cause of Action:**

17      5.    For compensatory damages in an amount to be proven at trial, but in an

18  amount in excess of $75,000.00;

19      6.    For punitive damages in an amount sufficient to punish RCS and deter

20  RCS and others from engaging in similar conduct;

21  **On the Fourth Cause of Action:**

22      7.    For compensatory damages in an amount to be proven at trial, but in an

23  amount in excess of $75,000.00;

24      8.    For punitive damages in an amount sufficient to punish RCS and deter

25  RCS and others from engaging in similar conduct;

26  **On the Fourth Cause of Action:**

27      9.    For compensatory damages in an amount to be proven at trial, but in an

28  amount in excess of $75,000.00;

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1         10.    For punitive damages in an amount sufficient to punish RCS and deter

2    RCS and others from engaging in similar conduct;

3    **On the Sixth Cause of Action:**

4         11.    For restitution and disgorgement of illegal revenues and profits;

5         12.    For an injunction enjoining further fraudulent, unlawful or unfair

6    business practices;

7    **On All Causes of Action:**

8         13.    For costs of suit incurred herein;

9         14.    For attorneys fees and other expenses as allowable by law and authorized

10   under contract; and

11        15.    For such other and further relief as the Court may deem just and

12   appropriate.

13   DATED:  November 4, 2011          GLASER WEIL FINK JACOBS
                                HOWARD AVCHEN & SHAPIRO LLP

14

15

16                             By:  _____
                               PAUL B. SALVATY

17                                  CAMERON M. KALUNIAN
                               Attorneys for Plaintiff
                               Westbourne Capital, LLC

18

19

20

21

22

23

24

25

26

27

28

*Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP*

746712

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

By: _____
      PAUL B. SALVATY
      CAMERON M. KALUNIAN
      Attorneys for Plaintiff
      Westbourne Capital, LLC

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

746712

# EXHIBIT 1

RESIDENTIAL CREDIT SOLUTIONS, INC.

as Servicer

and

Westbourne Capital, LLC

as Owner

SERVICING AGREEMENT

Dated as of January 13, 2011

Residential Mortgage Loans and REO Properties

## TABLE OF CONTENTS

**ARTICLE I.** DEFINITIONS ...........................................................................................1

**ARTICLE II.** OWNER'S ENGAGEMENT OF SERVICER TO PERFORM SERVICING RESPONSIBILITIES ........................................................................................9

Section 2.01.    Contract for Servicing; Possession of Servicing Files. ..........................9
Section 2.02.    Books and Records. ...............................................................................9
Section 2.03.    Custodial Agreement; Delivery of Documents. .....................................9
Section 2.04.    Transfer of Servicing. ..........................................................................10

**ARTICLE III.** SERVICING OF THE ASSETS .......................................................11

Section 3.01.    Servicer to Service. ..............................................................................11
Section 3.02.    Collection and Liquidation of Mortgage Loans. ..................................13
Section 3.03.    Establishment of and Deposits to Custodial Account. ..........................15
Section 3.04.    Permitted Withdrawals From Custodial Account. .................................16
Section 3.05.    Establishment of and Deposits to Escrow Account. .............................16
Section 3.06.    Permitted Withdrawals From Escrow Account. ....................................17
Section 3.07.    Notification of Adjustments. .................................................................18
Section 3.08.    RESERVED. ..........................................................................................18
Section 3.09.    Payment of Taxes, Insurance and Other Charges. ................................18
Section 3.10.    Protection of Accounts. ........................................................................19
Section 3.11.    Maintenance of Hazard Insurance. .......................................................19
Section 3.12.    Maintenance of Mortgage Impairment Insurance. ................................20
Section 3.13.    Maintenance of Fidelity Bond and Errors and Omissions Insurance. ...............21
Section 3.14.    Inspections. ...........................................................................................21
Section 3.15.    Restoration of Mortgaged Property. .....................................................22
Section 3.16.    RESERVED. ..........................................................................................22
Section 3.17.    Title, Management and Disposition of REO Property. ..........................22
Section 3.18.    Additional Reports. ...............................................................................23
Section 3.19.    Prepayment Charges. ............................................................................23
Section 3.20.    Credit Reporting. ..................................................................................24
Section 3.21.    Confidentiality/Protecting Customer Information. ................................24
Section 3.22.    Superior Liens. ......................................................................................24
Section 3.23.    MERS Membership. ..............................................................................24
Section 3.24.    Transfer Notices. ..................................................................................24
Section 3.25.    Losses, Expenses and Advances. ..........................................................25

**ARTICLE IV.** PAYMENTS TO OWNER ..............................................................26

Section 4.01.    Remittances. ..........................................................................................26
Section 4.02.    Statements to Owner. ............................................................................27

**ARTICLE V.** GENERAL SERVICING PROCEDURES ..........................................................27

Section 5.01.     Transfers of Mortgaged Property.....................................................................27
Section 5.02.     Satisfaction of Mortgages and Release of Mortgage Files. ..............................28
Section 5.03.     Servicing Compensation. ................................................................................28
Section 5.04.     Annual Audit Report.......................................................................................29
Section 5.05.     Annual Officer's Certificate. ...........................................................................29
Section 5.06.     Right to Examine Servicer Records. .................................................................29
Section 5.07      Owner's Instructions .....................................................................................31

**ARTICLE VI.** REPRESENTATIONS, WARRANTIES AND AGREEMENTS ......................30

Section 6.01.     Representations, Warranties and Agreements of the Servicer............................30
Section 6.02.     Representations, Warranties and Agreements of the Owner. ............................32
Section 6.03.     Representations, Warranties and Agreements of the Owner Regarding
                  the Assets. ....................................................................................................33
Section 6.04.     Indemnification by the Servicer......................................................................35
Section 6.05.     Indemnification by the Owner. .......................................................................35

**ARTICLE VII.** THE SERVICER ..........................................................................................37

Section 7.01.     Merger or Consolidation of the Servicer. ........................................................37
Section 7.02.     Limitation on Liability of the Servicer and Others...........................................37
Section 7.03.     Limitation on Resignation and Assignment by the Servicer. ............................37

**ARTICLE VIII.** TERMINATION ..........................................................................................38

Section 8.01.     Events of Default. ..........................................................................................38
Section 8.02.     Termination Without Cause............................................................................39
Section 8.03.     Termination Process.......................................................................................39

**ARTICLE IX.** [RESERVED]................................................................................................40

**ARTICLE X.** MISCELLANEOUS PROVISIONS ..................................................................40

Section 10.01.    Successor to the Servicer. ..............................................................................40
Section 10.02.    Costs..............................................................................................................41
Section 10.03.    Waiver of Jury Trial........................................................................................42
Section 10.04.    Notices. ..........................................................................................................42
Section 10.05.    Severability Clause. ........................................................................................42
Section 10.06.    No Personal Solicitation. ................................................................................43
Section 10.07.    Counterparts...................................................................................................43
Section 10.08.    Place of Delivery and Governing Law.............................................................43
Section 10.09.    Further Agreements. ......................................................................................43

Section 10.10.    Intention of the Parties; Relationship of Parties. ...............................................43
Section 10.11.    Successors and Assigns; Assignment of Servicing Agreement. ........................44
Section 10.12.    Waivers. .......................................................................................................44
Section 10.13.    Exhibits. .......................................................................................................44
Section 10.14.    General Interpretive Principles. .......................................................................44
Section 10.15.    Reproduction of Documents. ...........................................................................45
Section 10.16.    Force Majeure. ..............................................................................................45
Section 10.17.    Delivery of Reports. .......................................................................................45

<u>EXHIBITS</u>

| | |
|---|---|
| EXHIBIT A | SERVICING FEES |
| EXHIBIT B | RESERVED |
| EXHIBIT C | RESERVED |
| EXHIBIT D | MORTGAGE LOAN DOCUMENTS |
| EXHIBIT E | TRANSFER INSTRUCTIONS |
| EXHIBIT F | CUSTODIAL ACCOUNT CERTIFICATION |
| EXHIBIT G | ESCROW ACCOUNT CERTIFICATION |
| EXHIBIT H | CONTENTS OF ASSET SCHEDULE |
| EXHIBIT I | RESERVED |
| EXHIBIT J | MONTHLY REPORTING |
| EXHIBIT K | LIMITED POWER OF ATTORNEY |
| EXHIBIT L | RESERVED |
| EXHIBIT M | EXCEPTIONS SCHEDULE |

This is a Subservicing Agreement (the "Agreement"), dated as of January 13, 2011, by and between Westbourne Capital, LLC, having an office at 100 Wilshire Boulevard, Suite 250, Santa Monica, California 90401 (the "Owner") and Residential Credit Solutions, Inc. having an office at 4282 N. Freeway, Fort Worth, Texas 76137 ("Servicer").

W I T N E S S E T H:

WHEREAS, the Owner or an Affiliate owns certain mortgage loans secured by mortgages or deeds of trust on residential real property (as more fully defined herein, the "Mortgage Loans"), and one-to-four family, residential real properties which have been acquired by foreclosure or similar proceedings (each as more fully defined herein, the "REO Properties", collectively with the Mortgage Loans, the "Assets"), and may from time to time buy additional Assets;

WHEREAS, the Owner desires to retain the Servicer to subservice and provide certain management and disposition services for the Assets for the benefit of the Owner;

WHEREAS, the Owner and the Servicer desire to set forth the terms and conditions on which the Servicer will subservice and provide management and disposition services for the Assets.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which is hereby acknowledged, the Owner and Servicer hereby agree as follows:

## ARTICLE I.
### DEFINITIONS

The following terms are defined as follows:

Affiliate:  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Persons means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement:  This Subservicing Agreement, including all exhibits, schedules, amendments and supplements hereto.

Ancillary Income:  All income, excluding Prepayment Charges, attributable to the Mortgage Loans, derived from the Mortgage Loans after the Transfer Date including but not limited to interest received on funds deposited in the Custodial Account or any Escrow Account, late charges, insufficient fund fees, assumption fees, modification fees, name change fees, fees

associated with any repayment plan or forbearance agreement, optional insurance administrative fees and other similar fees with respect to the Assets.

Appraised Value: The value of the Mortgaged Property at the time of the Mortgage Loan's origination as used by the originating lender in underwriting such Mortgage Loan representing (a) in the case of a purchase, the lesser of the sales price of the Mortgaged Property and its appraised value at the time of sale, or (b) in the case of a refinancing, the appraised value of the Mortgaged Property at the time of such refinancing Asset.

Assets: The Mortgage Loans and REO Properties.

Asset Schedule:   The schedule of Assets annexed hereto, containing the information specified in Exhibit H hereto.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein or if the related Mortgage has been recorded in the name of MERS or its designee, such actions as are necessary to cause the Owner or its designee to be shown as the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

Balloon Mortgage Loan:  Any Mortgage Loan that by its original terms or by virtue of any modification provides for a monthly amortization schedule extending beyond its scheduled maturity date.

Balloon Payment:  With respect to a Balloon Mortgage Loan as of any date of determination, the amount outstanding on the maturity date of such Balloon Mortgage Loan in excess of the related Monthly Payment.

Base Servicing Fee: With respect to each Asset, the monthly fee the Owner shall pay to the Servicer as provided in Exhibit A hereto.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the states of California, New York, or Texas are authorized or obligated by law or executive order to be closed.

Combined Loan-to-Value Ratio: As to any Mortgage Loan at any date of determination, the ratio (expressed as a percentage) of the principal balance of such Mortgage Loan at the date of determination, plus the principal balance of any other Lien based upon the most recent information available to the Servicer, to the Appraised Value.

Condemnation Proceeds:  All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan documents.

Custodial Account:   The separate account or accounts created and maintained pursuant to Section 3.03.

Custodial Agreement: Any custodial agreement designated by the Owner and between the Owner and a Custodian.

Custodian:  The custodian(s) appointed by the Owner from time to time to hold certain Mortgage Loan Documents, which may be the Owner if specified thereby.

Determination Date:  The last day of the calendar month prior to the related Remittance Date.

Due Date: The day of the calendar month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period: With respect to each Remittance Date, the period commencing on the day after the Determination Date prior to the immediately prior Determination Date and ending on the immediately prior Determination Date.

Errors and Omissions Insurance:   Errors and Omissions Insurance to be maintained by the Servicer in accordance with Section 3.13.

Escrow Account:   The separate account or accounts operated and maintained pursuant to Section 3.05.

Escrow Payments:  With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other document.

Event of Default:  Any event set forth in Section 8.01.

Expenses:  Other than to the extent paid a part of Servicing Fees: (i) any out-of-pocket expense Servicer incurs in connection with its servicing and administrative obligations set forth in this Agreement to the extent such expense is not ordinary to the servicing function (but not including salaries, rent and other general operating expenses of Servicer normally classified as overhead); (ii) the "Additional Fees" set forth in Exhibit A; (iii) expenses of agents, vendors and other third party service providers customarily employed by servicers in performance of servicing functions; (iv) other expenses that the Owner has expressly agreed to pay or be liable for hereunder or under any other agreement with Servicer; and (v) expenses incurred in connection with the performance by Servicer at the request of the Owner of any activity that is not specifically required to be performed by Servicer under this Agreement and is not reasonably ancillary to any specific requirements of the Owner under this Agreement.

Fannie Mae:  Fannie Mae, or any successor thereto.

Fannie Mae Guides:   The Fannie Mae Selling Guide and the Fannie Mae Servicing Guide and all amendments or additions thereto.

FDIC:  The Federal Deposit Insurance Corporation or any successor thereto.

Fidelity Bond:  A fidelity bond to be maintained by the Servicer in accordance with Section 3.13.

Freddie Mac:  Freddie Mac (also known as the Federal Home Loan Mortgage Corporation), or any successor thereto.

High Cost Loan:  A Mortgage Loan classified as (a) a "high cost" loan under HOEPA, (b) a "high cost home," "threshold," "covered," "high risk home," "predatory" or similar loan under any other applicable state, federal or local law or (c) a Mortgage Loan categorized as "High Cost" or "Covered" pursuant to the Standard & Poor's Glossary for File Format for LEVELS®, Appendix E, as revised from time to time.

HOEPA:  The Home Ownership Equity Protection Act, as amended.

Incentive Fee:  An incentive fee set forth in Exhibit A, that is paid only once on each Asset.  The specific conditions to be met for the Servicer to earn an Incentive Fee are outlined in Exhibit A.

Insurance Proceeds:  With respect to each Asset, proceeds of insurance policies insuring the Mortgage Loan, the related Mortgaged Property or the REO Property, as applicable, including the proceeds of any hazard or flood insurance policy or title insurance policy.

Limited Power of Attorney:  The appointment of Servicer to act as Owner's true and lawful attorney-in-fact in matters pursuant to Exhibit K.

Liquidation Proceeds: Cash received in connection with the liquidation of a particular Asset, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related REO Property, if the Mortgaged Property is acquired in satisfaction of such Mortgage Loan.

Loan Set-up Fee: With respect to each Asset, the set-up fee the Owner shall pay to the Servicer as provided in Exhibit A hereto, payable upon the Transfer Date with respect to such Asset.

Loan to Value Ratio or LTV: As to any Mortgage Loan, the ratio (expressed as a percentage) of the outstanding principal balance of such Mortgage Loan at the date of determination to the Appraised Value.

Maximum Rate:  With respect to any adjustable rate Mortgage Loan and any due period, the maximum allowable Mortgage Interest Rate that may be charged the borrower under the related Mortgage Note.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The system of recording transfers of mortgages electronically maintained by MERS.

Modified Loan:  A Mortgage Loan in which the original terms of the Note or Mortgage have been changed other than in accordance with the original provisions Note or Mortgage.

MOM Loan:  Any Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

Monthly Payment:  The scheduled monthly payment of principal and interest as determined by the Note or applicable terms of the Modified Loan, on a Mortgage Loan, excluding any Balloon Payment.

Monthly Report:  The information contained in Exhibit J relating to each Mortgage Loan.

Moody's:  Moody's Investors Service, Inc. or any successor in interest.

Mortgage:  The mortgage, deed of trust or other instrument creating a first or junior lien on a Mortgaged Property securing a Mortgage Note (or a first or junior lien on (i) in the case of a cooperative, the related shares of stock in the cooperative securing the Mortgage Note and (ii) in the case of a ground rent, the leasehold interest securing the Mortgage Note).

Mortgage File:  The items pertaining to a particular Mortgage Loan referred to in Exhibit D annexed hereto, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Impairment Insurance Policy:  A mortgage impairment or blanket hazard insurance policy to be maintained by the Servicer in accordance with Section 3.12.

Mortgage Interest Rate:  The annual rate of interest borne on a Mortgage Note.

Mortgage Loan:  An individual mortgage loan that is the subject of this Agreement and identified on the Asset Schedule, which may be a first lien Mortgage Loan or a subordinate lien Mortgage Loan and which Mortgage Loan includes without limitation the Mortgage Loan Documents, the Monthly Payments, Principal Prepayments, Prepayment Charges, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents:  The items pertaining to a particular Mortgage Loan or REO Property as set forth on Exhibit D annexed hereto to the extent available from the Prior Servicer, subservicer or originator.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property:  The real property (stock or leasehold estate, if applicable) securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor:  The obligor on a Mortgage Note.

Officer's Certificate:  A certificate signed by the Chairman of the Board or the Vice Chairman of the Board or the President, or a Vice President or an assistant Vice President and by the Treasurer, the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Servicer, and delivered to the Owner as required by this Agreement.

Opinion of Counsel:  A written opinion of counsel, who may be an employee of the Servicer, reasonably acceptable to the Owner.

Originator:  Shall mean, with respect to any Mortgage Loan, the entity or entities that (a) took the relevant Mortgagor's loan application; (b) processed the relevant Mortgagor's loan application: and/or (c) closed and/or funded such Mortgage Loan.

Owner:  Westbourne Capital, LLC, a Utah limited liability company.

Person:  Any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

Prepayment Charge:  With respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a full or partial prepayment of such Mortgage Loan.

Prime Rate:  The prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal.

Principal Prepayment:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Charge or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Prior Servicer:  Any prior servicer or subservicer (other than the Servicer), collectively and individually, of any or all of the Mortgage Loans, including, without limitation, the Owner.

Qualified Depository:  A federal or state chartered depository institution the deposits in which are insured by the FDIC to the applicable limits and the long-term unsecured

debt obligations of which (or, in the case of a depository institution that is a subsidiary of a holding company, the short-term unsecured debt obligations of such holding company) are rated in one of the two highest rating categories of Standard & Poor's Ratings Services or Moody's Investors Service, Inc. (or a comparable rating if another rating agency is specified by the Owner by written notice to the Servicer) at the time any deposits are held on deposit therein.

Qualified Insurer:  A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae or Freddie Mac.

Remittance Date:  The 5th Business Day following the end of any calendar month.

REO Disposition:   The final settlement of sale by the Servicer of any REO Property.

REO Disposition Proceeds:   All amounts received with respect to an REO Disposition pursuant to Section 3.17.

REO Property:  A Mortgaged Property acquired by a Prior Servicer on behalf of the Owner or an Affiliate of the Owner or by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure, as described in Section 3.17.

Requirements:  All federal, state, or local laws and any other requirements of any government or agency or instrumentality thereof applicable to the servicing of the Mortgage Loans, the management of the REO Properties or the provision of services hereunder by the Servicer.

Servicer:  Residential Credit Solutions, acting as subservicer, or its successor in interest or assigns or any successor to the Servicer under this Agreement as herein provided.

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property or REO Property, (b) any enforcement or administrative or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property or REO Property, (d) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property or REO Property, fire and hazard insurance coverage, (e) in connection with the liquidation of a Mortgage Loan which has a Superior Lien, any expenditures relating to the purchase, maintenance or monitoring of any Superior Lien pursuant to Section 3.25 hereof, and (f) any losses sustained by the Servicer with respect to the liquidation of the Mortgaged Property or REO Property.  Prior to making any Servicing Advances in excess of $5,000, with the exception of real estate taxes, insurance payments, homeowner/condominium dues, and attorney fees, Servicer must obtain Owner's prior approval.  Notwithstanding the foregoing, or anything else to the contrary in this Agreement, Servicing Advances in excess of $5,000 for attorneys fees on non-routine litigation (non-routine litigation being all litigation being managed in Servicer's legal department as opposed to Servicer's operational foreclosure, bankruptcy or similar units) shall only be made subsequent to approval of a budget by Owner for such non-routine litigation.

Servicing Fees: All of the fees described in Exhibit A, including Loan Set-up Fees, Base Servicing Fees, Incentive Fees and Termination Fees.

Servicing File: The items pertaining to a particular Mortgage Loan including, but not limited to, the computer files, data disks, books, records, data tapes, notes, Mortgage Loan Documents and all additional documents generated as a result of or utilized in originating and/or servicing each Mortgage Loan, which are delivered to or generated by the Servicer and held in trust for the Owner by the Servicer.

Servicing Officer: Any officer of the Servicer involved in or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Servicer to the Owner upon request, as such list may from time to time be amended.

S&P: Standard & Poor's Rating Services, A Division of The McGraw-Hill Companies, Inc. or any successor in interest.

Specified Servicing Practices: The servicing standards and requirements set forth in this Agreement and, if not specified herein, the generally accepted practices of prudent lending or servicing institutions that service assets of the same type and quality in the jurisdiction where the related Mortgaged Property or REO Property is located (including industry standard collection and loan administrations procedures) and, notwithstanding the foregoing, in no event less than the servicing standards and requirements followed by Servicer for its assets and/or assets which Servicer services for others of the same type and quality which shall be in full compliance with all applicable federal, state and local laws, ordinances, rules and regulations.

Superior Lien: With respect to any Mortgage Loan, any other mortgage loan relating to the corresponding Mortgaged Property which creates a lien on the Mortgaged Property which is senior to the lien securing the Mortgage Loan.

Termination Fee: With respect to each Asset, the termination fee set forth in Exhibit A attached hereto.

Transfer Date: April 1, 2011.

Transfer Instructions: The transfer instructions set forth in Exhibit E hereto.

VA: The United States Department of Veterans Affairs and any successor thereto.

VA No-Bid: Any VA-guaranteed Mortgage Loan with respect to which VA has given written notice to Servicer or Owner that the VA will not establish a "Specified Amount" (as defined in the VA regulations) or that it will not accept conveyance of the related Mortgaged Property after foreclosure.

**ARTICLE II.**
OWNER'S ENGAGEMENT OF SERVICER TO
PERFORM SERVICING RESPONSIBILITIES

Section 2.01.   Contract for Servicing; Possession of Servicing Files.

From and after the Transfer Date, the Owner shall, by execution and delivery of this Agreement, contract with the Servicer as an independent contractor, subject to the terms of this Agreement, for the servicing of the Assets listed on the Asset Schedule.

The Servicer shall maintain a Servicing File with respect to each Asset in order to service such Asset pursuant to this Agreement and such Servicing File is and shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof. The possession of each Servicing File by the Servicer is at the will of the Owner for the sole purpose of servicing the related Asset, and such retention and possession by the Servicer is in a custodial capacity only. The ownership of each Mortgage Note, Mortgage, deed, and the contents of the Servicing File shall be vested in the Owner and the ownership of all records and documents with respect to the related Asset prepared by or which come into the possession of the Servicer shall immediately vest in the Owner and shall be retained and maintained, in trust, by the Servicer at the will of the Owner in such custodial capacity only.  The portion of each Servicing File retained by the Servicer pursuant to this Agreement shall be appropriately marked to clearly reflect the ownership of the related Asset by the Owner.  The Servicer shall release from its custody the contents of any Servicing File retained by it only in accordance with this Agreement or as required by applicable law.

Section 2.02.   Books and Records.

Record title to each Mortgage and the related Mortgage Note with respect to an REO Property shall remain in the name of (i) the Owner or (ii) in the name as the Owner shall designate. Record title to each deed with respect to each REO Property shall be taken in the name of (i) the Owner or (ii) in the name as the Owner shall designate.  Notwithstanding the preceding sentence, the ownership of each Mortgage Note, Mortgage, Deed and the contents of the Servicing File shall be vested solely in the Owner. With respect to each assignment of mortgage, if so requested by the Owner in its sole discretion, the Servicer, at the Owner's expense, shall cause MERS® to designate on the MERS System the Owner or its designee as the beneficial holder with respect to such Mortgage Loan or shall prepare and record each assignment of mortgage, and track such assignments of mortgage to ensure they have been recorded. The Owner shall pay all reasonable and necessary fees associated with the preparation, recording and tracking of the initial assignment of the Mortgage Loans from the Owner to a third party.  All rights arising out of the Assets shall be vested in the Owner.  All funds received on or in connection with an Asset shall be received and held by the Servicer in trust for the benefit of the Owner as the owner of the Assets pursuant to the terms of this Agreement, subject to the rights of Servicer under this Agreement.

Section 2.03.   Custodial Agreement; Delivery of Documents.

The Owner has delivered and released to the Custodian the Mortgage Loan Documents, as required pursuant to the Custodial Agreement if the Owner is not the Custodian.

The Custodian has certified its receipt of all such Mortgage Loan Documents required to be delivered, pursuant to the Custodial Agreement if the Owner is not the Custodian, as evidenced by the certification of the Custodian. The Owner shall be responsible for maintaining any Custodial Agreement and shall pay all reasonable fees and expenses of the Custodian, including fees and expenses due to the Servicer's requests of the Custodian in the normal course of Servicer's collection and foreclosure activities (including but not limited to follow up document deliveries of the Servicer, photocopies of documents made at the request of the Servicer and follow up document insertion fees).

The Servicer shall forward to the Custodian original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 3.01 within one (1) week of their execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within -90- days of its submission for recordation.

From time to time the Servicer may have a need for Mortgage Loan or REO Property documents to be released by the Custodian. If the Servicer shall require any of the Mortgage Loan or REO Property documents, the Servicer shall notify the Custodian in writing of such request. The Owner shall cause the Custodian to release, or shall release if the Owner is the Custodian, such documents, to the extent available, promptly upon request. To the extent that the Servicer obtains possession of any such document which is held by the Custodian, the Servicer agrees that it will act as the custodian and bailee and trustee of such documents for the benefit of the Owner during the term of this Agreement.

Section 2.04.   <u>Transfer of Servicing.</u>

On or prior to the Transfer Date, the Owner shall take or cause to be taken such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the Assets to the Servicer in accordance with any applicable requirements and the transfer instructions set forth in Exhibit E hereto, which instructions may be modified from time to time by mutual agreement of the Servicer and Owner. If any discrepancy exists between this Agreement and Exhibit E regarding the transfer of servicing, then Exhibit E shall control.

If an Asset is covered by a transferable life-of-loan real estate tax service contract, from First American Real Estate Tax Service, LLC the Servicer shall confirm any transfer of such contract from the Owner or its designee on the Transfer Date, if necessary. Within fifteen (15) days of the Transfer Date, based on the information received from the Prior Servicer, Servicer shall provide Owner with an electronic file of the related Assets which shall set forth whether each Asset is or is not covered by a transferable life-of-loan real estate tax service contract from First American Real Estate Tax Service, LLC. If within five (5) days of receipt of the electronic listing, Owner agrees with the loan listing as reflected on the electronic file or does not provide a rejection notice, Servicer shall, if an Asset is not covered by a transferable life-of-loan real estate tax service contract from First American Real Estate Tax Service, LLC, purchase such a tax service contract. The cost of any tax service contract, or the cost of any transfer of any tax service contract, shall be the responsibility of Owner, and Servicer may recover such costs as Servicing Advances hereunder, and/or invoice Owner for the cost thereof for each such Asset.

If an Asset is covered by a flood certification contract, the Servicer shall confirm any transfer of such contract to the Owner or its designee on the Transfer Date, if necessary. Within fifteen (15) days of the related Transfer Date, based on the information received from the Prior Servicer, Servicer shall provide Owner with an electronic file of the related Assets which shall set forth (i) whether each Asset is or is not covered by a flood certification contract and (ii) if an Asset is not covered by a flood certification contract, whether such Asset is required by applicable law or investor requirements to be covered by flood insurance.  If Owner does not object to such electronic file within five (5) days of receipt thereof, Servicer shall, if an Asset is not covered by a flood certification contract and is required by applicable law to be covered by a flood certification contract, purchase such a flood certification contract from a flood certification contract provider reasonably acceptable to Owner. The cost of any flood certification contract, or the cost of any transfer of any flood certification contract, shall be the responsibility of Owner, and Servicer may recover such costs as Servicing Advances hereunder, and/or invoice Owner for the cost thereof for each such Asset.

**ARTICLE III.**
SERVICING OF THE ASSETS

Section 3.01.   Servicer to Service.

The Servicer, as an independent contractor, shall service and administer the Assets from and after the Transfer Date and delivery, in accordance with the Transfer Instructions of all loan data files and all related Mortgage Loan documentation by the Owner, and shall have full power and authority, acting alone or through the utilization of a third party service provider, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement and Specified Servicing Practices.  The Servicer, unless otherwise agreed to by Servicer and Owner, shall be responsible for any and all acts of a third party service provider to which Servicer delegates its responsibilities under this Agreement after the Transfer Date, and the Servicer's utilization of such third party service provider shall in no way relieve the liability of the Servicer under this Agreement.  Without limiting the generality of the foregoing, Servicer shall not be responsible for the performance of any Custodian under a Custodial Agreement, or the providers of tax or flood services, or any third party service providers for acts prior to the Transfer Date.

The Owner shall provide the Servicer with the loan data file and all related Mortgage Loan Documents for each Asset no later than twenty-five (25) days before the Servicer is expected to perform the servicing.  The Owner shall notify the Servicer within two (2) Business Days of the Transfer Date, in writing, of any changes in the information contained in the loan data files.  The Owner agrees to provide the Servicer, within four (4) Business Days after the Servicer's request, copies of the Mortgage Note, the Mortgage or any other documents the Owner has with respect to a Mortgage Loan that the Servicer deems reasonably necessary in connection with its performance of the servicing of such Mortgage Loan.  The Servicer shall cooperate with the Owner in connection with the transfer of the servicing rights and obligations with respect to the Mortgage Loans pursuant to the Transfer Instructions.

Consistent with the terms of this Agreement, the Servicer may, with the prior consent of Owner, waive, modify or vary any term of any Mortgage Loan or consent to the

postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Servicer's reasonable and prudent determination such waiver, modification, postponement or indulgence is reasonably anticipated to maximize the return to the Owner. Unless the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the reasonable judgment of the Servicer, imminent, the Servicer shall not permit any modification with respect to any Mortgage Loan that would change the Mortgage Interest Rate, defer or forgive the payment of principal (except for actual payments of principal) or change the final maturity date on such Mortgage Loan without the written consent of the Owner or its designee. The Servicer shall request consent from the Owner to permit a modification if required pursuant to the foregoing, and the Owner shall provide written consent or notify the Servicer of its objection to such modification in writing within five (5) Business Days of its receipt of the Servicer's request. Failure of the Owner to respond in writing within five (5) Business Days of its receipt of the Servicer's request shall be deemed to be a consent by Owner. Without limiting the generality of the foregoing, the Servicer is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties provided that Servicer obtains Owner's consent prior to execution and delivery of any such instruments or documents.

The Servicer may, with the prior approval of the Owner, consent to the refinancing of any Superior Lien on any Mortgaged Property, provided that (i) the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing; (ii) the interest rate, or in the case of any Superior Lien which is an adjustable rate mortgage loan, the applicable Maximum Rate which can be charged under the related Mortgage Note is no more than 2.00% higher than the interest rate or the Maximum Rate, as the case may be, on the mortgage loan evidencing the existing Superior Lien immediately prior to the date of such refinancing; (iii) the mortgage loan evidencing the Superior Lien is not subject to negative amortization;(iv) the Monthly Payment on the mortgage loan evidencing the existing Superior Lien has not increased since the Due Date immediately prior to the date of such refinancing and (v) the Servicer has demonstrated that such refinancing maximizes the recoveries to the Owner. If required pursuant to the foregoing, the Servicer shall request consent from the Owner to permit such a refinancing and the Owner shall provide written consent or notify the Servicer of its objection to such refinancing in writing within five (5) Business Days of its receipt of the Servicer's request. Failure of the Owner to respond in writing within five (5) Business Days of its receipt of the Servicer's request shall be deemed to be a consent by Owner.

In servicing and administering the Assets, the Servicer shall employ procedures (including collection procedures) and exercise the same care that it would employ and exercise in servicing and administering similar mortgage loans and foreclosed properties for its own account and the account of others, giving due consideration to Specified Servicing Practices where such practices do not conflict with the requirements of this Agreement and the Owner's reliance on the Servicer. If reasonably required by the Servicer, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

Section 3.02.   Collection and Liquidation of Mortgage Loans.

Continuously from the Transfer Date until the date each Asset ceases to be subject to this Agreement, the Servicer shall proceed diligently to collect all payments due under each of the Assets when the same shall become due and payable and shall take special care in ascertaining and estimating Escrow Payments and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

The Servicer shall use commercially reasonable efforts, consistent with Specified Servicing Practices, to foreclose upon, obtain relief from bankruptcy, or otherwise comparably convert the ownership of such Mortgaged Properties as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.01.  The Servicer shall use commercially reasonable efforts to realize upon defaulted Mortgage Loans in such a manner as will maximize the receipt of principal and interest by the Owner, taking into account, among other things, the timing of foreclosure proceedings and the possibility of bankruptcy filings.  The foregoing is subject to the provisions that, in any case in which Mortgaged Property shall have suffered damage, the Servicer shall not be required to expend its own funds toward the restoration of such property unless (1) it shall determine in its discretion that such restoration will increase the proceeds of liquidation of the related Mortgage Loan to the Owner after reimbursement to itself for such expenses, as applicable; (2) such restoration is required by the municipality or other authority to prevent additional fees or charges or to comply with any federal, state or local requirement; or (3) it is directed to do so by Owner.  Any such expenditures shall constitute Servicing Advances hereunder and shall require the prior consent of Owner in the event such expenditures exceed $5,000.  In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 3.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as (1) the Servicer would take in servicing and administering similar mortgage loans for its own account and the account of others under similar circumstances, taking into consideration the fact that Owner's Mortgage Loans are not subject to the Homeowner's Affordability and Stability Plan and therefore should not be compared to mortgage loans which are subject to Home Affordable Modification Plan (HAMP) qualification or to Home Affordable Refinance Plan (HARP) qualification, (2) shall be consistent with Specified Servicing Practices, and (3) the Servicer shall determine prudently to be in the best interest of the Owner.  In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 3.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days beyond the expiration of any grace or cure period and unless the Servicer determines that the charge off of a particular Mortgage Loan is a better course of action the Servicer shall commence foreclosure proceedings.  In such connection, the Servicer shall make all necessary and proper Servicing Advances, provided, however, that the Servicer shall not be required to make a Servicing Advance in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property or REO Property, unless directed otherwise by Owner, that such preservation, restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Owner after reimbursement to itself for such expenses and that such expenses will be recoverable by Servicer on behalf of the Owner either

through Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 3.04) or through Insurance Proceeds (respecting which it shall have similar priority).

Notwithstanding anything to the contrary contained in this Agreement, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, (a) the Servicer shall have no obligation to commence foreclosure proceedings or obtain title to Mortgage Property securing a Mortgage Loan as a result of or in lieu of foreclosure or otherwise if (i) such Mortgage Loan is subject to the HOEPA or any regulations related thereto, (ii) such Mortgage Loan qualifies as a High Cost Loan, (iii) such Mortgage Loan is subject to any restrictions or limits on the foreclosure process, including requirements as to the timing or notice of any steps for foreclosure, applicable to Owner or any of its present or past Affiliates and not applicable to mortgage lending and servicing institutions generally, (iv) Owner or Owner's designee is not the owner of record of the related Mortgage Loan, or (v) the Servicer determines, in its reasonable judgment, that foreclosure and/or acquisition of title to Mortgaged Property would expose it to material risk or liability pertaining to the acts, errors or omissions of the Originator or Prior Servicers, and (b) in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Owner or its designee otherwise requests, an environmental inspection or review of such Mortgaged Property to be conducted by a qualified inspector, such inspection or review shall be arranged by the Servicer. The cost for such inspection or review shall be deemed a Servicing Advance. Upon completion of the inspection, the Servicer shall provide the Owner or its designee with a written report of such environmental inspection.

After reviewing the environmental inspection report, the Servicer shall notify Owner in writing of any possible or actual environmental issues with the applicable Assets and provide Servicer's recommendation, with substantiation for same, as to how to proceed with respect to the Mortgaged Property. The Owner shall determine how the Servicer is to proceed with respect to the Mortgaged Property and shall notify the Servicer of such direction in writing. In the event that the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall not proceed with foreclosure or acceptance of a deed in lieu of foreclosure. In the event that the environmental inspection report is inconclusive as to the whether or not the Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall not, without the written direction from the Owner or its designee, proceed with foreclosure or acceptance of a deed in lieu of foreclosure. In the event the Servicer proceeds with foreclosure or acceptance of a deed in lieu of foreclosure in accordance with this paragraph, the Servicer shall be reimbursed for all reasonable costs associated with such foreclosure or acceptance of a deed in lieu of foreclosure and any related environmental clean up costs, as applicable from amounts in the Custodial Account pursuant to Section 3.04 hereof, or directly from Owner pursuant to Section 3.28 hereof. In the event the Owner directs the Servicer not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Servicer shall be reimbursed for all Servicing Advances made with respect to the related Mortgaged Property from the Custodial Account pursuant to Section 3.04 hereof, or directly from Owner pursuant to Section 3.28 hereof.

Section 3.03.   Establishment of and Deposits to Custodial Account.

The Servicer shall segregate and hold all funds collected and received on the Assets separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "_____". The Custodial Account shall be established with a Qualified Depository and shall be evidenced by a certification in the form of Exhibit F attached hereto.  Funds deposited in the Custodial Account may be drawn on by the Servicer in accordance with Section 3.04.  The Servicer shall deposit in the Custodial Account within - two (2) Business Day of the Servicer's receipt, and retain therein, the following collections received by the Servicer and payments made by the Servicer after the Transfer Date:

(i)    all payments on account of principal on the Mortgage Loans, including all Principal Prepayments and all Prepayment Charges;

(ii)   all payments on account of interest on the Mortgage Loans;

(iii)  all Liquidation Proceeds;

(iv)   all Insurance Proceeds including amounts required to be deposited pursuant to Section 3.11 (other than proceeds to be held in the Escrow Account and applied to the restoration and repair of the Mortgaged Property or released to the Mortgagor in accordance with the related Mortgage Loan documents and Specified Servicing Practices);

(v)    all Condemnation Proceeds that are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the related Mortgage Loan documents and Specified Servicing Practices;

(vi)   any other amount required to be deposited in the Custodial Account pursuant to this Agreement;

(vii)  any amounts required to be deposited by the Servicer pursuant to Section 3.11 in connection with the deductible clause in any blanket hazard insurance policy; and

(viii) any amounts received with respect to or related to any REO Property or REO Disposition Proceeds.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of Servicing Fees and Ancillary Income need not be deposited by the Servicer into the Custodial Account.  Amounts on deposit in the Custodian Account shall be held uninvested.  Any benefit derived from funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Servicer and the Servicer shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 3.04. Additionally, any other benefit derived from the Custodial Account associated with the receipt, disbursement and accumulation of principal, interest, taxes, hazard insurance, mortgage insurance, etc. shall accrue to the Servicer. The Servicer shall keep and maintain, in an electronic

format acceptable to Owner, separate accounting, on a Mortgage Loan by Mortgage Loan basis and on an REO Property by REO Property basis.

Section 3.04.   Permitted Withdrawals From Custodial Account.

The Servicer shall, from time to time, withdraw funds from the Custodial Account for the following purposes:

(i)    to make payments to the Owner in the amounts and in the manner provided for in Section 4.01;

(ii)   in the event the Servicer has elected not to retain the Servicing Fee out of any Monthly Payments prior to the deposit of such Monthly Payment or recovery in the Custodial Account, to pay to itself the related Servicing Fee;

(iii)  to reimburse itself for unreimbursed Servicing Advances and Expenses and unpaid Servicing Fees, it being understood that, in the case of any such reimbursement, the Servicer's right thereto shall be prior to the rights of the Owner;

(iv)   to pay itself interest on funds deposited in the Custodial Account;

(v)    to transfer funds to another Qualified Depository in accordance with Section 3.11 hereof;

(vi)   to withdraw funds deposited in error; and

(vii)  to clear and terminate the Custodial Account upon the termination of this Agreement.

The Servicer shall keep and maintain, in an electronic format acceptable to Owner, separate accounting, on a Mortgage Loan by Mortgage Loan basis, and on an REO Property by REO Property basis, for the purpose of justifying any withdrawal from the Custodial Account.

Section 3.05.   Establishment of and Deposits to Escrow Account.

The Servicer shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "_____" which shall be evidenced by a certification in the form of Exhibit G attached hereto.  The Escrow Accounts shall be established with a Qualified Depository.  Funds deposited in the Escrow Account may be drawn on by the Servicer in accordance with Section 3.06.  The Servicer shall deposit in the Escrow Account or Accounts within one (1) Business Day of the Servicer's receipt, and retain therein:

(i)    all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement; and

(ii)     all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property.

(iii)     the Servicer shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 3.06. The Servicer shall be entitled to retain any interest paid on funds deposited in the Escrow Account by the depository institution, other than interest on escrowed funds required by law to be paid to the Mortgagor. To the extent required by law, the Servicer shall pay interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account may be non-interest bearing or that interest paid thereon is insufficient for such purposes. Amounts on deposit in the Escrow Account shall be held uninvested. The Servicer shall keep and maintain, in an electronic format acceptable to Owner, separate accounting, on a Mortgage Loan by Mortgage Loan basis and on an REO Property by REO Property basis.

Section 3.06.   <u>Permitted Withdrawals From Escrow Account.</u>

Withdrawals from the Escrow Account or Accounts may be made by the Servicer only:

(i)     to effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage;

(ii)     to reimburse the Servicer for any Servicing Advance made by the Servicer with respect to a related Mortgage Loan, but only from amounts received on the related Mortgage Loan which represent late collections of Escrow Payments thereunder;

(iii)     to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Mortgage Loan;

(iv)     to the extent permitted by applicable law, for transfer to the Custodial Account and application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

(v)     for application to restoration or repair of the Mortgaged Property in accordance with Section 3.15;

(vi)     to pay to the Servicer, or any Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account;

(vii)     to withdraw funds deposited in error; and

(viii)     to clear and terminate the Escrow Account on the termination of this Agreement.

The Servicer will be responsible for the administration of the Escrow Accounts and will be obligated to make Servicing Advances to the Escrow Account in respect of its obligations under this Section 3.06, reimbursable from the Escrow Accounts or Custodial

Account to the extent not collected from the related Mortgagor, or payable directly from Owner pursuant to Section 3.28 hereof. The Servicer shall keep and maintain, in an electronic format acceptable to Owner, separate accounting, on a Mortgage Loan by Mortgage Loan basis, and on an REO Property by REO Property basis, for the purpose of justifying any withdrawal from the Escrow Account.

Section 3.07.   <u>Notification of Adjustments.</u>

With respect to each adjustable rate Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related interest rate adjustment date and shall adjust the Monthly Payment on the related mortgage payment adjustment date, if applicable, in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. The Servicer shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and Monthly Payment adjustments. The Servicer shall promptly, upon written request therefor, deliver to the Owner such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Servicer or the receipt of notice from the Owner that the Servicer has failed to adjust a Mortgage Interest Rate or Monthly Payment in accordance with the terms of the related Mortgage Note, the Servicer shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss or deferral caused the Owner thereby.

Section 3.08.   <u>RESERVED.</u>

Section 3.09.   <u>Payment of Taxes, Insurance and Other Charges.</u>

(a)   With respect to each Mortgage Loan which provides for Escrow Payments and with respect to each REO Property, the Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property or REO Property, and the status of fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) ("Property Charges") and shall effect payment thereof prior to the applicable penalty or termination date, employing for such purpose (with respect to the related Mortgage Loans) deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect timely payment of all such charges irrespective of each Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments.

(b)   To the extent that a Mortgage Loan does not provide for Escrow Payments, the Servicer shall make a Servicing Advance from its own funds to effect payment of all Property Charges upon receipt of notice of any failure to pay on the part of the Mortgagor, or at such other time as the Servicer determines to be in the best interest of the Owner, provided, that in any event the Servicer shall pay such charges on or before the earlier of (i) any date by which payment is necessary to preserve the lien status of the Mortgage or (ii) the date

by which is the earlier of (x) ninety days after the date on which such charges first became due and (y) payment is required in order to avoid the accrual of penalties or fees with respect to non-payment of such Property Charges.  The Servicer shall pay any late fee or penalty which is payable due to any delay in payment of any Property Charge.  Penalties and late fees that are a result of the Prior Servicer's action or inaction are "Prior Servicer Penalties".  The Servicer is required to advance Prior Servicer Penalties.  Such Prior Servicer Penalties shall be deemed a Servicing Advance, to be reimbursed in accordance with Section 3.28 hereof.

Section 3.10.   Protection of Accounts.

The Servicer may transfer the Custodial Account or the Escrow Account to a different Qualified Depository from time to time and shall notify the Owner of each transfer.

The Servicer shall bear any expenses, losses or damages sustained by the Owner if the Custodial Account and/or the Escrow Account are not demand deposit accounts.

Section 3.11.   Maintenance of Hazard Insurance.

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance such that all buildings upon each Mortgaged Property are insured by a generally acceptable insurer acceptable under the Fannie Mae Guide against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, in an amount which is at least equal to the lesser of (i) the replacement value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor or the loss payee from becoming a co-insurer.

If upon origination of the Mortgage Loan, the related Mortgaged Property was located in an area identified in the Federal Register by the Flood Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect with a generally acceptable insurance carrier acceptable to Fannie Mae or Freddie Mac in an amount representing coverage equal to the lesser of (i) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement cost basis (or the unpaid balance of the mortgage if replacement cost coverage is not available for the type of building insured) and (ii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. If at any time during the term of the Mortgage Loan the Servicer determines in accordance with applicable law and pursuant to the Fannie Mae Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Servicer shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage within forty-five (45) days after such notification, the Servicer shall immediately force place the required flood insurance on the Mortgagor's behalf as a Servicing Advance.

If a Mortgage Loan is secured by a unit in a condominium project, the Servicer shall verify that the coverages required of the owner's association, including hazard, flood, liability, and fidelity coverage, are being maintained in accordance with then current Fannie Mae requirements and use reasonable efforts to secure from the owner's association its agreement to notify the Servicer promptly of any change in insurance coverage or of any condemnation or casualty loss that may have a material effect on the value of the Mortgaged Property as security.

In the event that the Owner or the Servicer shall determine that the Mortgaged Property should be insured against loss or damage by hazards and risks not covered by the insurance required to be maintained by the Mortgagor pursuant to the terms of the Mortgage, the Servicer shall communicate and consult with the Mortgagor with respect to the need for such insurance and bring to the Mortgagor's attention the desirability of protection of the Mortgaged Property.

All policies required hereunder shall name the Servicer as loss payee, and shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Servicer shall not accept any such insurance policies from insurance companies unless such companies are acceptable to Fannie Mae and are licensed to do business in the jurisdiction in which the Mortgaged Property is located. The Servicer shall determine that such policies provide sufficient risk coverage and amounts, that they insure the property owner, and that they properly describe the property address. The Servicer shall furnish to the Mortgagor a formal notice of expiration of any such insurance in sufficient time for the Mortgagor to arrange for renewal coverage by the expiration date.

Pursuant to Section 3.03, any amounts collected by the Servicer under any such policies (other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the related Mortgaged Property, or property acquired in liquidation of the Mortgage Loan, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 3.15) shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 3.04.

If the Mortgagor fails to maintain hazard insurance or flood insurance with respect to the related Mortgaged Property, the Servicer shall, if the Mortgaged Property is occupied, make Servicing Advances in an amount sufficient to maintain the existing Mortgagor's policy; provided that, if the Mortgagor has vacated the Mortgaged Property the Servicer shall force-place such insurance.

Section 3.12.   Maintenance of Mortgage Impairment Insurance.

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire and hazards covered under extended coverage on all of the Assets, or Servicer and Owner agree to utilize such a policy maintained by Owner and administered by Servicer, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 3.11 and otherwise complies with all other requirements

of Section 3.11, Servicer shall conclusively be deemed to have satisfied its obligations as set forth in Section 3.11. Any amounts collected by the Servicer under any such policy relating to an Asset shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 3.04. Such policy may contain a deductible clause, in which case and if such policy is a Servicer policy, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property, a policy complying with Section 3.11, and there shall have been a loss which would have been covered by such policy, the Servicer shall deposit in the Custodial Account at the time of such loss the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Servicer's funds, without reimbursement therefore.  Upon request of the Owner, the Servicer shall cause to be delivered to the Owner a certificate of insurance for a Servicer policy and a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Owner.

Section 3.13.   <u>Maintenance of Fidelity Bond and Errors and Omissions Insurance.</u>

The Servicer shall maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans ("Servicer Employees"). Any such Fidelity Bond and Errors and Omissions Insurance Policy shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees. Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Servicer against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 3.13 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Servicer from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be acceptable to Fannie Mae and Freddie Mac.  Upon the execution of this Agreement and any other time upon the request of the Owner, the Servicer shall cause to be delivered to the Owner a certificate of insurance for such Fidelity Bond and Errors and Omissions Insurance Policy and a statement from the surety and the insurer that such Fidelity Bond and Errors and Omissions Insurance Policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Owner.

Section 3.14.   <u>Inspections.</u>

The Servicer shall inspect each Mortgaged Property and REO Property as often as deemed necessary by the Servicer to assure itself that the value of the Mortgaged Property or REO Property is being preserved. In addition, if any Mortgage Loan is more than 90 days delinquent, the Servicer shall inspect the Mortgaged Property and shall conduct subsequent inspections in accordance with Specified Servicing Practices or as may be required by the primary mortgage guaranty insurer. Upon request by Owner, the Servicer shall produce an electronic report of each such inspection and provide such report to Owner or Owner's designee.

Section 3.15.   <u>Restoration of Mortgaged Property.</u>

The Servicer need not obtain the approval of the Owner prior to releasing any Insurance Proceeds or Condemnation Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Specified Servicing Practices. For claims greater than $15,000, at a minimum, the Servicer shall comply with the following conditions in connection with any such release of Insurance Proceeds or Condemnation Proceeds:

(i)      the Servicer shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

(ii)      the Servicer shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens;

(iii)      the Servicer shall verify that the Mortgage Loan is not in default; and

(iv)      pending repairs or restoration, the Servicer shall place the Insurance Proceeds or Condemnation Proceeds in the Escrow Account.

If the Owner is named as an additional loss payee, the Servicer is hereby empowered to endorse any loss draft issued in respect of such a claim in the name of the Owner.

Section 3.16.   <u>RESERVED.</u>

Section 3.17.   <u>Title, Management and Disposition of REO Property.</u>

In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Owner's designee.

The Servicer in consultation with the Owner, shall manage, conserve, protect and operate each REO Property for the Owner solely for the purpose of maximizing the net present value of proceeds recoverable by Owner and in accordance with any REO marketing plan approved by the Servicer.  The Owner shall review all listing prices and initial and updated marketing plans prior to the listing or subsequent change of listing of the property. The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in accordance with Specified Servicing Practices and in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account and the account of others, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall attempt to sell the same (and may temporarily rent the same for a period not greater than one (1) year with the expressed written approval of the Owner, except as otherwise provided below). The Servicer shall use commercially reasonable efforts to dispose of the REO Property and communicate purchase offers for REO Properties to the Owner prior to their acceptance.

The disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the reasonable interests of the Owner provided that the Servicer communicates the purchase offers to the Owner prior to their acceptance.  The proceeds of sale of the REO Property shall be promptly deposited in the Custodial Account, net of any Expenses or other third party costs related to such sale, including but not limited REO Asset Management Fees, to the extent not previously recovered, and the Servicer shall reimburse itself for any related unreimbursed Servicing Advances and unpaid Servicing Fees.  The Servicer shall make Servicing Advances of all funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Section 3.11, such Servicing Advances may be netted from the monthly remittance. The Servicer shall make monthly distributions on each Remittance Date to the Owner of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses and advances described in this Section 3.17) received during the preceding calendar month.

Section 3.18.   Additional Reports.

The Servicer shall furnish to the Owner or its designee on or before the 5th Business Day of each month, reports in form and substance mutually agreeable to the parties, which reports shall meet special servicing standards agreed to by Servicer and shall include, but not be limited to, reports regarding (a) a litigation report which set forth any litigation or governmental proceedings affecting any Mortgage Loans and (b) a delinquency report with respect to Mortgage Loans that are delinquent by twelve months or more.  No less than monthly, the Servicer shall provide or cause to be provided to the Owner in a mutually agreed upon format, the Monthly Report including but not limited to the information contained in Exhibit J.  However, should the Servicer not capture the data for a field listed in Exhibit J, Owner will afford Servicer with a reasonable amount of time to locate the proper data source and change the required systems in order to successfully fulfill the monthly reporting needs of Owner.

Section 3.19.   Prepayment Charges.

The Servicer or any designee of the Servicer shall not waive any Prepayment Charge with respect to any Mortgage Loan which contains a Prepayment Charge which prepays during the term of the penalty. If the Servicer or its designee fails to collect the Prepayment Charge upon any prepayment of any Mortgage Loan which contains a Prepayment Charge and data was available as of the Transfer Date or provided subsequently to ascertain such, the Servicer shall pay the Owner an amount equal to the Prepayment Charge which was not collected.  Notwithstanding the above, the Servicer or its designee may waive a Prepayment Charge without paying the Owner the amount of the Prepayment Charge if (i) the Mortgage Loan is in default (defined as 61 days or more delinquent) and such waiver would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan or (ii) if the prepayment is not a result of a refinance by the Servicer or any of its Affiliates and (a) the Mortgage Loan is foreseen to be in default and such waiver would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan or (b) the collection of the Prepayment Charge would be in violation of applicable laws or (c) the Mortgage Loan is or was a High Cost Loan or (iii) the Servicer, in its best judgment, believes the imposition of the Prepayment Charge will negatively impact the ability to maximize the recovery with respect to the Mortgage Loan

Section 3.20.   Credit Reporting.

For each Mortgage Loan, the Servicer shall accurately and fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to each of the following credit repositories:  Equifax Credit Information Services, Inc., Trans Union, LLC and Experian Information Solution, Inc., on a monthly basis.

Section 3.21.   Confidentiality/Protecting Customer Information.

Each party agrees that it shall comply with all applicable laws and regulations regarding the privacy or security of Customer Information and shall maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of Customer Information, including, if applicable, maintaining security measures designed to meet the Interagency Guidelines Establishing Standards for Safeguarding Customer Information, 66 Fed. Reg. 8616 and complying with the privacy regulations under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., and the rules promulgated thereunder.  For purposes of this section, "Customer Information" means any personal information concerning a Mortgagor that is disclosed by one party to this Agreement to the other.

Section 3.22.   Superior Liens.

If the Servicer is notified that any superior lienholder has accelerated or intends to accelerate the obligations secured by the Superior Lien, or has declared or intends to declare a default under the mortgage or the promissory note secured thereby, or has filed or intends to file an election to have the Mortgaged Property sold or foreclosed, the Servicer shall take, on behalf of the Owner, whatever actions are necessary to protect the interests of the Owner in accordance with Specified Servicing Practices.  Any payments of a Superior Lien pursuant to the foregoing shall be Servicing Advances subject to reimbursement pursuant to Section 3.25 hereof; provided, that the Servicer shall not make such a Servicing Advance to pay a Superior Lien except with the prior consent of Owner and to the extent that it determines in its reasonable good faith judgment that such advance would be recoverable from Liquidation Proceeds on the related Mortgage Loan and in no event in an amount that is greater than the then outstanding principal balance of the related Mortgage Loan.  The Servicer shall thereafter take such action as is necessary to recover the amount so advanced.

Section 3.23.   MERS Membership.

If the Servicer's membership in MERS is terminated by MERS for any reason, the Servicer shall, within thirty (30) days of the effective date of such termination, deliver to the recording office Assignments of Mortgage from MERS to the Owner or its designee.

Section 3.24.   Transfer Notices.

(i)      Within fifteen (15) days before the Servicer initiates servicing under this Agreement, the Servicer and the Owner shall provide any required notice to the Mortgagors of the transactions contemplated herein through a notice jointly prepared and delivered by the Servicer and the Owner in accordance with applicable law and the Transfer Instructions.  The parties shall cooperate to accomplish such notification in a timely and efficient manner as will best facilitate the assumption by

the Servicer of the servicing responsibilities. The form of the notice to be sent to Mortgagors shall be approved by the Owner and the Servicer before mailing.

(ii)     The Owner shall notify, or cause to be notified, all insurers, by overnight or registered mail, that all insurance premium billings for the Mortgage Loans must be sent to the Servicer. Additionally, the Owner shall, prior to the Transfer Date, obtain the written consent of any insurers that have the contractual right to approve the assumption of the servicing responsibilities by the Servicer.

(iii)     The Owner, with the reasonable assistance of the Servicer, shall notify the applicable taxing authorities (except as such is handled through the tax service company) of the assumption of the servicing responsibilities by the Servicer and include instructions to deliver all notices and tax bills to the Servicer or the applicable tax service provider, as the case may be, from and after the Transfer Date.

(iv)     The Owner shall notify all attorneys who, on the Transfer Date, are providing legal services to or on behalf of the Owner in connection with pending foreclosure or litigation involving one or more of the Mortgage Loans, of the transfer of the servicing rights and obligations with respect to the Mortgage Loans to the Servicer.

(v)     The costs and expenses related to any joint Mortgagor notice required to be provided under Section 3.24 (i) shall be split. The costs and expenses related to all other notifications required to be made under this Section 3.24 shall be paid by the Owner.

Section 3.25.   Losses, Expenses and Advances.

(i)     Owner shall remain responsible, as between Owner and Servicer, for losses related to Owner's investment in the Mortgage Loans. Such losses for which Owner shall remain responsible include, but are not limited to: credit losses, special hazard insurance premiums, earthquake losses, losses resulting from the absence or inadequacy of hazard insurance or flood insurance for a Mortgaged Property in accordance with applicable requirements (except in cases in which the Servicer has been responsible for maintaining and has failed to do so), foreclosure losses, REO Property losses, VA No-Bid Losses, and losses in connection with the Servicemembers Civil Relief Act.

(ii)     The Servicer may reimburse itself from the Custodial Accounts or Escrow Accounts for all Servicing Advances and Expenses in accordance with Sections 3.04 and 3.06. To the extent the funds in the Custodial Accounts or Escrow Accounts are insufficient for reimbursement of Servicer in accordance with Sections 3.04 and 3.06, the Servicer shall deliver an invoice to Owner, and the Owner shall reimburse the Servicer, by wire transfer in immediately available funds for such Servicing Advances and Expenses within three (3) Business Days after receipt of such invoice.

(iii)     Out-of-pocket Expenses incurred by Servicer as a Servicing Advance and billed by third parties on a monthly basis that will be reimbursed by Owner without approval of Owner include, but are not limited to, Expenses less than $5,000 associated with the following: appraisals and broker price opinions (pre- and post-foreclosure), title work, attorney fees, legal filing fees, inspection fees (interviews, drive-bys, clean out inspections after vacated, professional services such as property surveys, repair inspections, Environmental Protection Agency inspections, etc.), property maintenance (utilities, lawn care, snow removal, securing costs, repairs, winterization, removal of debris, clean-up after vacated), photographs, loss drafts, and travel (transportation, meals, lodging, rental cars). Any of

the foregoing Expenses or Servicing Advances in excess of $5,000, with the exception of real estate taxes, insurance payments, homeowners/condominium dues, and attorney fees (excluding attorney fees on non-routine litigation as described in the definition of Servicing Advances in Article 1 unless the condition set out in that definition has been satisfied) require the prior approval of Owner before payment by Servicer to third parties.

(iv)    Owner shall be solely responsible for all guaranty fees, credit enhancement fees, custodial fees (and related shipping costs), trustee fees, and costs to record assignments.  Except as otherwise expressly set forth in this Agreement, Servicer shall be solely responsible for the direct and indirect internal and administrative costs associated with its obligations as Servicer of the Mortgage Loans hereunder, such costs to include but not be limited to: personnel, facilities; supplies; mailing and computer system expenses, regardless of whether Servicer elects to contract with third party vendors to perform all or any portion of such internal and administrative functions.

(v)    Except as otherwise provided in this Section, any litigation related solely to a single Mortgage Loan (other than litigation between or among Owner or any of its Affiliates, on the one hand, and Servicer and any of its Affiliates, on the other hand) shall be managed by Servicer or its counsel on behalf of Owner, including foreclosure, evictions, quiet title and bankruptcy filings, at Servicer's internal expense with respect to administration of such litigation (excluding third party costs for which Owner shall remain responsible), unless Owner shall elect otherwise with respect to any particular litigation(s), in which case Owner shall manage and administer such litigation(s) on behalf of Owner or any of its Affiliates.  Servicer shall not manage (on behalf of Owner or any of its Affiliates) any class action claim in which Owner or any of its Affiliates is a defendant or any litigation based upon a claim brought by Owner unless Owner shall elect otherwise with respect to any particular litigation(s), in which case Servicer shall manage and administer such litigation(s) on behalf of Owner or any of its Affiliates.  Servicer shall not, without the prior written consent of Owner, settle or compromise any claim against Owner arising out of or relating to any such litigation, other than any such settlement involving solely the payment of money damages not to exceed Five Thousand and 00/100 Dollars ($5,000.00) in any one (1) instance.  Servicer shall cooperate in obtaining or making available information or documents respecting Mortgage Loans involved in litigation as may be reasonably required by Owner or its counsel.  Owner shall promptly reimburse Servicer for any out-of-pocket costs that Servicer incurs in connection with any such litigation, provided that Servicer must obtain the Owner's approval of a litigation budget on all non-routine litigation as described in the definition of Servicing Advances in Article 1 of this Agreement.

## ARTICLE IV.
### PAYMENTS TO OWNER

Section 4.01.   <u>Remittances.</u>

On each Remittance Date the Servicer shall remit by wire transfer of immediately available funds to the Owner all amounts deposited in the Custodial Account as of the close of business on the last Business Day of the preceding calendar month (net of charges against or withdrawals from the Custodial Account pursuant to Section 3.04).

With respect to any remittance received by the Owner after the second Business Day following the Business Day on which such remittance payment was due, the Servicer shall pay to the Owner interest on any such late payment at an annual rate equal to the Prime Rate,

adjusted as of the date of each change, plus 3.00 percent, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the day following such second Business Day and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with the distribution payable on the next succeeding Remittance Date. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

Section 4.02.   Statements to Owner.

On or prior to each Remittance Date, the Servicer shall furnish to the Owner or its designee electronic monthly remittance advices in the Servicer's standard form and format, all such advices relating to the period ending on the last day of the preceding calendar month.

Beginning with the portion of the calendar year 2011 during which Servicer services the Assets hereunder, the Servicer shall prepare and file any and all tax returns, information statements or other filings for such partial year 2011 and subsequent tax years required to be delivered to any governmental taxing authority or to the Owner pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans as is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time.

**ARTICLE V.**
**GENERAL SERVICING PROCEDURES**

Section 5.01.   Transfers of Mortgaged Property.

The Servicer, if Servicer reasonably believes it to be in the best interest of Owner, shall use commercially reasonable efforts to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note and to deny assumption by the person to whom the Mortgaged Property has been or is about to be sold whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains liable on the Mortgage and the Mortgage Note. When the Mortgaged Property has been conveyed by the Mortgagor, the Servicer shall, to the extent it has knowledge of such conveyance, exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause applicable thereto.

If the Servicer reasonably believes (1) enforcement is not in the best interest of Owner or (2) it is unable under applicable law to enforce such "due-on-sale" clause, the Servicer shall enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Servicer is unable under applicable law to require that the original Mortgagor remain liable under the Mortgage Note and the Servicer has the prior consent of the primary mortgage guaranty insurer, a substitution of liability agreement with the Owner of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the Owner of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note. If an assumption fee is

collected by the Servicer for entering into an assumption agreement, such fee will be retained by the Servicer as additional servicing compensation.  In connection with any such assumption, neither the Mortgage Interest Rate borne by the related Mortgage Note, the term of the Mortgage Loan nor the outstanding principal amount of the Mortgage Loan shall be changed without the written consent of Owner or Owner's designee.

To the extent that any Mortgage Loan is assumable, the Servicer shall inquire diligently into the creditworthiness of the proposed transferee, and shall use the underwriting criteria for approving the credit of the proposed transferee which are used by the Servicer, its Affiliates or Fannie Mae with respect to underwriting mortgage loans of the same type as the Mortgage Loan.  If the credit of the proposed transferee does not meet such underwriting criteria, the Servicer diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

Section 5.02.   Satisfaction of Mortgages and Release of Mortgage Files.

Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Servicer shall notify the Owner in the monthly remittance advice as provided in Section 4.02, and may request the release of any Mortgage Loan Documents from the Owner in accordance with this Section 5.02 hereof. The Servicer shall cause a satisfaction of mortgage to be prepared and recorded, if required by the federal, state or local laws and any other requirements of any government or agency or instrumentality thereof applicable to the servicing of the Mortgage Loans, or the provision of services hereunder, by the Servicer, within the time frame so prescribed.  In the event the Servicer fails to do so, the Servicer shall be responsible for any and all penalties, fines, and damages associated therewith; provided, however, that Servicer shall not be responsible for any such penalties, fines and damages if the delay resulted from the failure of the Prior Servicer, the Custodian or the Owner to provide any documents required to record a satisfaction of that Mortgage in a timely fashion.

If the Servicer satisfies or releases a Mortgage without first having obtained payment in full of the indebtedness secured by the Mortgage, and is unable to cure such error or recover the payment due, the Servicer shall deposit into the Custodial Account the entire outstanding principal balance, plus all accrued interest on such Mortgage Loan, after application of any payments received or other recovery.  The Servicer shall maintain the Fidelity Bond and Errors and Omissions Insurance Policy as provided for in Section 3.13 insuring the Servicer against any loss it may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

Section 5.03.   Servicing Compensation.

As consideration for servicing the Assets subject to this Agreement, the Servicer shall retain the relevant Base Servicing Fee for each Asset remaining subject to this Agreement during any month or part thereof.  The Base Servicing Fee shall be payable monthly and shall be computed, on the basis of the number of Mortgage Loans being serviced by Servicer on the first Business Day of such month, plus the number of Mortgage Loans for which servicing commenced under this Agreement during such month after first Business Day of such month. All servicing compensation shall be prorated for the portion of the month during which the

related Mortgage Loan is serviced; however, at a minimum, servicing compensation will be based on a fifteen (15) day period.

Additional servicing compensation in the form of assumption fees, to the extent provided in Section 5.01 and all other Ancillary Income, interest or other benefit on funds on deposit in the Custodial Accounts and Escrow Accounts as provided in Sections 3.03 and 3.05, and all other Servicing Fees as listed on Exhibit A hereto, may be retained by the Servicer to the extent not required to be deposited in the Custodial Account, withdrawn from the Custodial Account to the extent permitted, and/or paid by Owner in accordance with Section 3.28.

The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

Section 5.04.   Annual Audit Report.

On or before March 31st of each year beginning March 31, 2011, the Servicer, at its expense, shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records relating to the servicing of assets similar in nature to the Assets and that such firm is of the opinion that the provisions of this or similar Agreements have been complied with, and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, nothing has come to their attention which would indicate that such servicing has not been conducted in compliance therewith, except for (i) such exceptions as such firm shall believe to be immaterial, and (ii) such other exceptions as shall be set forth in such statement. By providing Owner a copy of a Uniform Single Attestation Program Report from their independent public accountants on an annual basis, Servicer shall be considered to have fulfilled its obligations under this Section 5.04.

Section 5.05.   Annual Officer's Certificate.

The Servicer shall deliver to the Owner, on or before   March 31st, each year beginning  March 31, 2011, an Officer's Certificate, stating that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement or similar agreements has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken by the Servicer to cure such default.

Section 5.06.   Right to Examine Servicer Records.

The Owner shall have the right to examine and audit any and all of the books, records, or other information of the Servicer, whether held by the Servicer or by another on its behalf, with respect to or concerning this Agreement or the Assets, during business hours or at such other times as may be reasonable under applicable circumstances, upon reasonable advance notice.  The Owner shall pay its own expenses in connection with any such examination; provided, that, the Servicer shall not charge the Owner additional costs for such examination.

Servicer shall advise the Owner of any audit, investigation or review of its servicing practices, procedures or operations by any third party agency, person or entity as it relates to the Assets or any Asset and which may have an adverse affect on the Assets or on the Servicer's ability to perform under the provisions of this Agreement. The Servicer agrees to provide the Owner with a copy of any and all reports, documents, findings and other information, memoranda or correspondence relating to such audit, investigation or review as it pertains to Assets as soon as reasonably possible but in any case within ten (10) calendar days of the Servicer's receipt or generation of the same, to the extent permitted by law or the agreement under which the audit, investigation or review is performed.

The Servicer shall make available to the Owner on occasion, at no additional cost to the Owner, access to allow the Owner to monitor or otherwise manage its Assets on-site at the Servicer's offices during regular business hours, to the extent such access does not unreasonably interfere with Servicer's business. Such on-site access shall include a means for Owner to view the status of its Assets, a phone and fax machine.

Section 5.07    Owner's Instructions

In servicing the Assets, whenever Servicer is to act only upon Owner's instructions, Servicer shall promptly request such instruction from Owner, and Owner shall provide those instructions within five (5) Business Days of Servicer's request. Upon the failure of Owner to provide instructions after Servicer's request for instructions within the timeframe set forth above, Owner acknowledges that, in Servicer's sole discretion, Servicer may either take no action or take such action as it deems appropriate pursuant to accepted servicing practices provided such action must also be consistent with any limitation on or Owner approval requirements applicable to Servicing Advances contained in this Agreement. As provided in Section 6.05, Owner shall indemnify Servicer and hold Servicer harmless from any Damages either Owner or Servicer shall suffer or incur in connection with any action or inaction of Servicer consistent with this Section 5.07, including but not limited to inaction while waiting for Owner instructions after requesting those instructions or inaction waiting for required approval of Servicing Advances..

## ARTICLE VI.
### REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 6.01.   Representations, Warranties and Agreements of the Servicer.

The Servicer hereby makes the following representations and warranties to the Owner as of the date of this Agreement and the Transfer Date:

(a)    Due Organization and Authority. The Servicer is a corporation duly organized, validly existing and in good standing under the state of its incorporation and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state

require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the terms of this Agreement; the Servicer has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Servicer and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Servicer and all requisite corporate action has been taken by the Servicer to make this Agreement valid and binding upon the Servicer in accordance with its terms;

(b)     Ordinary Course of Business.   The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Servicer;

(c)     No Conflicts.   Neither the execution and delivery of this Agreement, the acquisition of the servicing responsibilities by the Servicer or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's charter or by-laws or any legal restriction or any agreement or instrument to which the Servicer is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject, or impair the ability of the Servicer to service the Assets, or impair the value of the Assets;

(d)     Ability to Perform.   The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(e)     No Pending Adverse Actions.   There is no action, suit, proceeding or investigation commenced, or to the best of Servicer's knowledge pending or threatened, by any governmental agency or other regulatory or administrative body having jurisdiction over the Servicer which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Servicer, or in any material impairment of the right or ability of the Servicer to carry on its business substantially as now conducted, or in any material liability on the part of the Servicer, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein, or which would be likely to impair materially the ability of the Servicer to perform under the terms of this Agreement;

(f)     No Consent Required.   No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of or compliance by the Servicer with this Agreement, or if required, such approval has been obtained prior to the Transfer Date;

(g)     No Default.   The Servicer is not in default, and no event or condition exists that after the giving of notice or lapse of time or both, would constitute an event of

default under any material mortgage, indenture, contract, agreement, judgment, or other undertaking, to which the Servicer is a party or which purports to be binding upon it or upon any of its assets, which default could impair materially the ability of the Servicer to perform under the terms of this Agreement;

   (h) Ability to Service.  The Servicer has the facilities, procedures, and experienced personnel necessary for the sound servicing of assets of the same type as the Assets;

   (i) No Commissions to Third Parties.  The Servicer has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction other than the Owner;

   (j) No Material Change. There has been no material adverse change in the business, operations, financial condition or assets of the Servicer since the date of the Servicer's most recent financial statements;

   (k) MERS.  The Servicer is a member of MERS in good standing; and

   (l) The Servicer is an approved servicer by Freddie Mac or Fannie Mae.

Section 6.02. <u>Representations, Warranties and Agreements of the Owner.</u>

   The Owner hereby makes the following representations and warranties to the Servicer as of the date of this Agreement and the Transfer Date:

   (a) Due Organization and Authority.  The Owner is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Owner, and in any event the Owner is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the terms of this Agreement; the Owner is not a federal or state governmental entity, agency or instrumentality, or otherwise controlled by or affiliated with a federal or state governmental entity, agency or instrumentality; the Owner has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Owner and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Owner and all requisite corporate action has been taken by the Owner to make this Agreement valid and binding upon the Owner in accordance with its terms;

   (b) Ordinary Course of Business.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Owner;

(c)     No Conflicts.  Neither the execution and delivery of this Agreement, or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Owner's charter or by-laws or any legal restriction or any agreement or instrument to which the Owner is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Owner or its property is subject, or impair the ability of the Servicer to service the Assets;

(d)     Ability to Perform.  The Owner does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(e)     No Default.  The Owner is not in default, and no event or condition exists that after the giving of notice or lapse of time or both, would constitute an event of default under any material mortgage, indenture, contract, agreement, judgment, or other undertaking, to which the Owner is a party or which purports to be binding upon it or upon any of its assets, which default could impair materially the ability of the Owner to perform under the terms of this Agreement;

(f)     No Pending Adverse Actions.  There is no action, suit, proceeding or investigation commenced, or to the best of Owner's knowledge pending or threatened, by any governmental agency or other regulatory or administrative body having jurisdiction over the Owner which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Owner, or in any material impairment of the right or ability of the Owner to carry on its business substantially as now conducted, or in any material liability on the part of the Owner, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Owner contemplated herein, or which would be likely to impair materially the ability of the Owner to perform under the terms of this Agreement;

(g)     No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Owner of or compliance by the Owner with this Agreement, or if required, such approval has been obtained prior to the Transfer Date;

(h)     No Commissions to Third Parties.  The Owner has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction other than the Servicer; and

(i)     MERS.  The Owner is a member of MERS in good standing.

Section 6.03.   Representations, Warranties and Agreements of the Owner Regarding the Assets.

The Owner hereby makes the following representations and warranties to the Servicer as of the Transfer Date:

(a)     Assets as Described.  The information set forth in the Asset Schedule and the information contained on the electronic data file delivered to the Servicer is true and correct.

(b)     Delivery of Books and Records.  Owner will, on or before the Transfer Date, deliver, or cause to be delivered, to the Servicer or the Custodian, as applicable, all of the books, records, data, files and Mortgage Loan Documents, including records on microfiche or its equivalent, reasonably required by the Servicer to document and service each Assets; such books, records, data, files and documents contain all of the items (including but not limited to hazard insurance policies, flood insurance policies and private mortgage insurance policies) which are required by applicable law and the Specified Servicing Practices to service the Assets; are true, accurate and complete in all material respects; and it is reasonable for Servicer to rely thereon.

(c)     Ownership.  Owner or Owner's designee is the record titleholder of each Mortgage Loan, holding title sufficient to enable Servicer to foreclose upon such Mortgage Loan in accordance with this Agreement.

(d)     Flood Insurance.  If any of the Mortgage Loans are secured by Mortgaged Properties located, or any REO Properties are located, in Federal Emergency Management Agency designated flood areas, then to the extent required by applicable law or the Specified Servicing Practices flood insurance policies are or will be in full force and effect in the amounts required by applicable law at the time of servicing transfer or otherwise indicated in Exhibit M.

(e)     Hazard Insurance.  All Mortgaged Properties and REO Properties are and will be insured against fire and have extended coverage insurance in the amounts required by Fannie Mae or Freddie Mac at the time of servicing transfer or otherwise indicated in Exhibit M; all insurance premiums on such insurance policies have been or will have been paid in a timely manner; and there have been or will have been no fire losses on the Mortgaged Properties or REO Properties where Owner's estimate of loss is materially greater than the net recovery from the fire insurance carrier.  To Owner's knowledge, there have been no fire losses on the Mortgaged Properties or REO Properties as to which there is a pending coinsurance claim.

(f)     No Litigation.  There is not pending or, to Owner's actual knowledge, threatened Litigation, or any order, injunction, settlement or decree outstanding, against or relating to the Assets or servicing thereof that could materially adversely affect the servicing of the Assets, the Assets or the performance by Owner or Servicer of their respective obligations under this Agreement except as indicated in Exhibit M.  No Mortgagor is a named plaintiff in any class action lawsuit.

(g)     Application of Payments.  All calculations required to be made by the Prior Servicers with respect to the amount of principal, interest, escrow payments and other amounts due and owing by a Mortgagor from time to time under each Mortgage Loan have been made in compliance with all applicable law, the requirements of the Mortgage Loan Documents and the Specified Servicing Practices.  All invoices transmitted to the Mortgagors by the Prior Servicers for principal, interest, escrow payments and all other amounts due and payable under each Asset have been prepared, and the funds collected from the Mortgagors

have been applied for the payment of such amounts, in compliance with all Applicable Requirements.

        (h)    Compliance with Applicable Laws.  Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been satisfied.

        (i)    High Cost Loans.  No Mortgage Loan is a High Cost Loan.

        (j)    Prepayment Charges.  Any Prepayment Charges contained in the Mortgage Loan Documents is fully enforceable by Servicer for the benefit of Owner unless otherwise indicated in Exhibit M.

Section 6.04.  <u>Indemnification by the Servicer.</u>

        The Servicer shall defend and indemnify the Owner, its successors or assigns, officers, and directors (the "Servicer Indemnified Parties") and hold them harmless against any and all claims, losses, damages, liabilities, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Servicer Indemnified Parties may sustain in any way related to the breach of the Servicer's representations and warranties set forth in this Agreement or the failure of the Servicer to perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement.  The Servicer shall immediately notify the Owner if a claim is made by a third party with respect to this Agreement or the Assets, assume (with the prior written consent of the Owner) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree which may be entered against it or any Servicer Indemnified Party in respect of such claim and follow any written instructions received from the Owner in connection with such claim.  The Owner promptly shall reimburse the Servicer for all amounts advanced by it pursuant to the preceding sentence, except when the claim is any way related or the failure of the Servicer to service and administer the Assets in strict compliance with the terms of this Agreement.  The provisions of this Section shall survive termination of this Agreement.

Section 6.05.  <u>Indemnification by the Owner.</u>

        The Owner shall defend and indemnify the Servicer, its successors or assigns, officers, and directors (the "Owner Indemnified Parties") and hold them harmless against any and all claims, losses, damages, liabilities, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Owner Indemnified Parties may sustain in any way related to the breach of the Owner's representations and warranties set forth in this Agreement or the failure of the Owner to perform its duties in strict compliance with the terms of this Agreement.  The Owner shall immediately notify the Servicer if a claim is made by a third party with respect to this Agreement or the Assets, assume (with the prior written consent of the Servicer) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree which may be entered against it or any Owner Indemnified Party in respect of such

claim and follow any written instructions received from the Servicer in connection with such claim. Nothwithstanding the foregoing, Owner shall not be responsible for any judgments, decrees, counsel fees or expenses if it is determined by the Court that Servicer's actions were not consistent with Specified Servicing Practices. In addition, the Owner shall defend and indemnify the Owner Indemnified Parties and hold them harmless from and against any and all claims, losses, damages, liabilities, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Owner Indemnified Parties may sustain from or related to:

(i)      any failure of the Owner, any Prior Servicer or the Originator to have complied with all applicable laws, rules and regulations, including but not limited to those related to the preparation, execution and notarization of affidavits of all kinds, the Mortgage Documents, any requirements of investors or insurers, or the failure to comply with legally compliant customary origination and/or servicing procedures of prudent financial institutions that originate and/or service, as applicable assets similar to the Assets in the jurisdictions in which the Mortgaged Properties and REO Properties are located, with respect to the origination, purchase, sale, securitization or servicing of the Assets except as otherwise indicated;

(ii)      any failure of the Prior Servicers or Owner to maintain or have maintained any licenses, registrations or approvals necessary to carry on its business as now being conducted; or

(iii)      The Servicer's compliance with written instructions of the Owner and Servicer's actions or failures to act in the absence of instructions from Owner as set forth in Section 5.07

(iv)      the continuation by Servicer of the past practices of any Prior Servicer that fail to comply with applicable law, the Mortgage Loan Documents or the Specified Servicing Practices, except if and to the extent the Servicer should have become aware of such violations under the standard of care pursuant to Section 3.01 hereof; or

(v)      any failure of Servicer to comply with applicable law, the Mortgage Loan Documents or the Specified Servicing Practices as a direct result of there being any incomplete or missing Mortgage Loan Documents, Mortgage Files or Servicing Files through no fault of Servicer; or

(vi)      any litigation, claim or other proceeding commenced against Servicer after the Transfer Date as a result of Servicer's acting as, or status as, servicer of the Assets hereunder, including in connection with any foreclosure action pursued by Servicer, to the extent that such litigation, claim or other proceeding does not arise out of or result from Servicer's breach of any provision of this Agreement; or

(vii)      the imposition of any restrictions or limits on the foreclosure process, including requirements as to the timing or notice of any steps for foreclosure, applicable to Owner or any of its present or past Affiliates and not applicable to mortgage lending and servicing institutions generally, provided that in the event of the imposition of any such restrictions Owner and Servicer may agree to make adjustments to the servicing compensation with respect to some or all of the Assets in lieu of such indemnity.

The provisions of this Section shall survive termination of this Agreement.

## ARTICLE VII.
### THE SERVICER

Section 7.01.   Merger or Consolidation of the Servicer.

The Servicer shall keep in full effect its existence, rights and franchises, and shall obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Assets and to perform its duties under this Agreement.

Any Person into which the Servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding, provided, however, that the successor or surviving Person shall be an institution having a net worth of not less than $25,000,000.

Section 7.02.   Limitation on Liability of the Servicer and Others.

Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Servicer and any director, officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.  The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Assets in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Servicer may, with the consent of the Owner, undertake any such action which it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties hereto.  In such event, the Servicer shall be entitled to reimbursement from the Owner for the reasonable legal expenses and costs of such action.

Section 7.03.   Limitation on Resignation and Assignment by the Servicer.

The Owner has entered into this Agreement with the Servicer in reliance upon the independent status of the Servicer, and the representations as to the adequacy of its servicing facilities, plant, management, personnel, systems, records and procedures, its integrity, reputation and financial standing, and the continuance thereof.  Therefore, the Servicer shall not assign this Agreement or the servicing responsibilities hereunder or delegate its rights or duties hereunder or any portion hereof (to other than a third party service provider) or sell or otherwise dispose of all or substantially all of its property or assets without the prior written consent of the Owner, which consent shall not be unreasonably withheld.

The Servicer shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Servicer and the Owner or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Servicer.  Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Owner which Opinion of Counsel shall be in form and substance acceptable to the Owner.  No such resignation shall become effective until a successor shall have assumed the Servicer's responsibilities and obligations hereunder in the manner provided in Section 10.01.

Without in any way limiting the generality of this Section 7.03, in the event that the Servicer either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof (to other than a third party service provider) or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written consent of the Owner, then the Owner shall have the right to terminate this Agreement upon notice given as set forth in Section 8.01.

**ARTICLE VIII.**
TERMINATION

Section 8.01.   Events of Default.

(a)   Each of the following shall constitute an Event of Default on the part of the applicable party:

(i)   any failure by a party to remit to the other party any payment required to be made under the terms of this Agreement which continues unremedied for a period of five (5) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the party; or

(ii)   failure by a party duly to observe or perform in any material respect any other of the covenants or agreements on the part of such party set forth in this Agreement which continues unremedied for a period of sixty (60) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the party; or

(iii)   failure by a party to maintain licenses to do business, or own or service residential mortgage loans, as applicable in any jurisdiction where the Mortgaged Properties are located, to the extent required under applicable law; or

(iv)   a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, including bankruptcy, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against a party and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(v)   a party shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the party or of or relating to all or substantially all of its property; or

(vi)     a party shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency, bankruptcy or reorganization statute, make an assignment for the benefit of its creditors, voluntarily suspend payment of its obligations or cease its normal business operations for three (3) Business Days; or

(vii)     a party attempts, without the consent of the other party, to assign its rights or obligations hereunder or to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or to delegate its duties (to other than a third party service provider) hereunder or any portion thereof; or

(viii)    its net worth shall be less than $10,000,000

(ix)     In each and every such case, so long as an Event of Default shall not have been remedied, in addition to whatsoever rights a party may have at law or equity to damages, including injunctive relief and specific performance, the non-defaulting party, by notice in writing to the other party, may terminate this Agreement.

By a written notice, either party may waive any default by the other in the performance of its obligations hereunder and its consequences.  Upon any waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

Section 8.02.    Termination Without Cause.

This Agreement and the Servicer's rights hereunder with respect to some or all of the Assets shall terminate upon: (i) the later of (a) the distribution of the final payment or liquidation proceeds on the last Mortgage Loan to the Owner (or advances by the Servicer for the same), and (b) the disposition of all REO Property acquired upon foreclosure of the last Mortgage Loan and the remittance of all funds due hereunder, or (ii) mutual consent of the Servicer and the Owner in writing, (iii) at the sole option of the Owner, without cause, upon sixty (60) days written notice, provided however, that Owner shall not select the affected Assets subject to such termination in a manner to materially adversely affect Servicer or the average cost of servicing the Assets, or (iv) at the sole option of the Servicer, without cause, upon sixty (60) days written notice in the event that the aggregate unpaid principal balance of the Mortgage Loans decreases to ten percent (10%) or less of the aggregate unpaid principal balance of the Mortgage Loans as of the Transfer Date.  Any notice of termination pursuant to clause (iii) above shall be in writing and delivered to the Servicer by registered mail to the address set forth at the beginning of this Agreement.  The Owner and the Servicer shall comply with the termination procedures set forth in Sections 8.03 and 10.01 hereof.

Section 8.03.    Termination Process.

Upon any termination of this Agreement (other than in accordance with Section 8.02(i)), the Servicer shall prepare, execute and deliver to the successor entity designated by the Owner any and all documents and other instruments, place in such successor's possession all Servicing Files, and, in a timely manner, do or cause to be done all other acts or things necessary

or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer of the Assets and related documents (i) at the Servicer's sole expense if the termination is based on an Event of Default by Servicer, (ii) at the Owner's sole expense if the termination is, a termination by Owner pursuant to Section 8.02(iii), or a termination by Servicer pursuant to Section 8.02(iv), or (iii) as mutually agreed if the termination is in accordance with Section 8.02(ii).  The Servicer shall, in a timely manner, cooperate with the Owner and any successor servicer in effecting the termination of the servicing responsibilities and rights hereunder, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Assets.

In addition, in the event the Owner terminates the Servicer without cause with respect to some or all of the Assets in accordance with Section 8.02(iii), the Servicer terminates the Agreement without cause in accordance with Section 8.02(iv), or a termination by Servicer based on an Event of Default by the Owner, the Owner shall be required to pay to the Servicer the related Termination Fee.  The Owner or a successor servicer shall reimburse the Servicer for all accrued and unpaid Servicing Fees and unreimbursed Servicing Advances and Expenses upon the termination of servicing for any reason.  Neither party shall forfeit any amounts due to it by virtue of such termination.

## ARTICLE IX.
### [RESERVED]

## ARTICLE X.
### MISCELLANEOUS PROVISIONS

Section 10.01.  <u>Successor to the Servicer.</u>

Simultaneously with the termination of the Servicer's responsibilities and duties under this Agreement pursuant to Sections 7.03, 8.01 or 8.02, the Owner or its designee shall (i) succeed to and assume all of the Servicer's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor having the characteristics set forth in Section 7.01 and which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Servicer under this Agreement simultaneously with the termination of the Servicer's responsibilities, duties and liabilities under this Agreement.   In connection with such appointment and assumption, the Owner may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree, subject to payment of outstanding amounts due to the Servicer, and provided, however, that no such compensation shall be in excess of that permitted the Servicer under this Agreement without the consent of the Owner.  In the event that the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned sections, the Servicer shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor.  The resignation or removal of the Servicer, or other termination of this Agreement, pursuant to the aforementioned sections shall not become effective until a successor shall be appointed pursuant to this Section 10.01 and shall in no event relieve either party of liability for a breach of this

Agreement prior to such resignation or removal, or other termination of this Agreement, or pursuant to the indemnification obligations hereunder.

Within 45 days of the appointment of a successor entity by the Owner, the Servicer shall prepare, execute and deliver to the successor entity any and all documents and other instruments, place in such successor's possession all Servicing Files, and, in a timely manner, do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer of the Mortgage Notes and related documents. The Servicer shall, in a timely manner, cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder and the transfer of servicing responsibilities to the successor servicer, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Servicer and to the Owner an instrument accepting such appointment, wherein the successor shall make the representations and warranties set forth in Section 6.01, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if originally named as a party to this Agreement. Any termination or resignation of the Servicer or termination of this Agreement pursuant to Sections 7.03, 8.01 or 8.02 shall not affect any claims either party may have against the other arising out of the other's actions or failure to act prior to any such termination or resignation.

The Servicer shall deliver promptly to the successor servicer the funds in the Custodial Account and Escrow Account and all Mortgage Loan Documents and related documents and statements held by it hereunder and the Servicer shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and definitively vest in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Servicer.

Upon a successor's acceptance of appointment as such, the Servicer shall notify by mail the Owner of such appointment in accordance with the procedures set forth in Section 10.04.

Section 10.02. <u>Costs</u>

The Owner shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys. Costs and expenses incurred in connection with the transfer of the servicing responsibilities, including fees for delivering Servicing Files, shall be paid by the Owner. The Owner shall pay for the costs associated with the preparation, delivery and tracking of Assignments of Mortgages. The Owner shall be responsible for the costs associated with the recording of Assignments of Mortgage.

Section 10.03.  Waiver of Jury Trial.

EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 10.04.  Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed by overnight courier, addressed as follows (or such other address as may hereafter be furnished to the other party by like notice):

(i)     If to the Owner:
        Westbourne Capital, LLC

        100 Wilshire Blvd., Suite 250

        Santa Monica, CA  90401

        Attn: Lisette Smyth


(ii)    If to the Servicer:

        Residential Credit Solutions, Inc.
        4282 North Freeway
        Fort Worth, TX 76137
        Attn:  Mark D. Rogers

        with a copy to:
        Residential Credit Solutions, Inc.
        4282 North Freeway
        Fort Worth, TX 76137
        Attn:  Dennis Stowe

Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee.

Section 10.05.  Severability Clause.

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Asset shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which

prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

Section 10.06.  <u>No Personal Solicitation.</u>

From and after the Transfer Date, unless specifically notified by the Owner with respect to specific Mortgage Loans, the Servicer hereby agrees that it will not take any action or permit or cause any action to be taken by any of its agents or Affiliates, or by any independent contractors on the Servicer's behalf, to personally, by telephone or mail, solicit the borrower or obligor under any related Mortgage Loan [for any purpose whatsoever, including] to refinance a Mortgage Loan, in whole or in part, without the prior written consent of the Owner. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by the Servicer or any Affiliate of the Servicer which are not targeted to the Mortgagors, including, without limitation, mass mailings based upon commercially acquired mailing lists, newspaper, radio, television advertisements, website ads, monthly account statements or "VRU" recorded communications shall not constitute solicitation in violation of this Section 10.06. Notwithstanding anything to the contrary, this Section 10.06 shall not prohibit the Servicer or its agents or Affiliates from serving the refinancing needs or other financial needs of a Mortgagor who without solicitation, contacts the Servicer or its agents or Affiliates directly.

Section 10.07.  <u>Counterparts.</u>

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The parties agree that this Agreement and signature pages may be transmitted between them by facsimile and that faxed signatures may constitute original signatures and that a faxed signature page containing the signature (faxed or original) is binding upon the parties.

Section 10.08.  <u>Place of Delivery and Governing Law.</u>

This Agreement shall be deemed in effect when a fully executed counterpart thereof is received by the Owner in the State of New York and shall be deemed to have been made in the State of New York.  The Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York.

Section 10.09.  <u>Further Agreements.</u>

The Owner and the Servicer each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 10.10.  <u>Intention of the Parties; Relationship of Parties.</u>

It is the intention of the parties that the Owner is conveying, and the Servicer is receiving only a contract for servicing the Assets.  Accordingly, the parties hereby acknowledge

that the Owner remains the sole and absolute owner of the Assets and all rights related thereto. Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for the Owner.

Section 10.11. Successors and Assigns; Assignment of Servicing Agreement.

This Agreement shall bind and inure to the benefit of and be enforceable by the Servicer and the Owner and the respective successors and assigns of the Servicer and the Owner. This Agreement shall not be assigned, pledged or hypothecated by either party without the prior written consent of the other party.

Section 10.12. Waivers.

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

Section 10.13. Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 10.14. General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    The terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender.

(b)    Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles.

(c)    References herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement.

(d)    A reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions.

(e)    The words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision,.

(f)    The term "include" or "including" shall mean by reason of enumeration.

Section 10.15.  <u>Reproduction of Documents.</u>

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process.  The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 10.16.  <u>Force Majeure.</u>

Servicer will not be responsible for delays or failures in such performance resulting from acts of God, strikes, riots, acts of war, terrorism, earthquakes or other similar events.

Section 10.17.  <u>Delivery of Reports.</u>

Any report delivered hereunder shall be delivered in an electronic format.

IN WITNESS WHEREOF, the Servicer and the Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

WESTBOURNE CAPITAL, LLC
(Owner)

By: _____
Name: Jeffrey Kirsch
Title: Authorized Signatory

RESIDENTIAL    CREDIT    SOLUTIONS, INC.
(Servicer)

By: _____
Name: DENNIS STOWE
Title: PRESIDENT

EXHIBIT A

SERVICING FEES - ATTACHED

EXHIBIT B

[RESERVED]

EXHIBIT C
[RESERVED]

EXHIBIT D

MORTGAGE LOAN DOCUMENTS

The following documents shall constitute the Mortgage Loan Documents with respect to each Mortgage Loan or REO Property:

(a) the original Mortgage Note bearing all intervening endorsements and signed in the name of the last endorsee (the "Last Endorsee") by an authorized officer. To the extent that there is no room on the face of the Mortgage Notes for endorsements, the endorsement may be contained on an allonge, if state law so allows and the Custodian has been so advised by Owner that state law so allows. If the Mortgage Loan was acquired by the Owner in a merger, the endorsement must be by "[Last Endorsee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the Last Endorsee while doing business under another name, the endorsement must be by "[Last Endorsee], formerly known as [previous name]";

(b) the original of any guarantee executed in connection with the Mortgage Note;

(c) the original Mortgage with evidence of recording thereon.  If in connection with any Mortgage Loan, the Owner was and is unable to deliver or cause to be delivered the original Mortgage with evidence of recording thereon on or prior to the Transfer Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Owner shall have delivered or caused to be delivered to the Custodian, (i) in the case of a delay caused by the public recording office, a photocopy of such Mortgage, together with an Officer's Certificate of the Owner (or certified by the title company, escrow agent, or closing attorney) stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Owner; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(d) the originals of all assumption, modification, consolidation or extension agreements, if any, with evidence of recording thereon;

(e) the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Assignment of Mortgage must be duly

recorded only if recordation is either necessary under applicable law or commonly required by private institutional mortgage investors in the area where the Mortgaged Property is located or on direction of the Owner as provided in this Agreement.  If the Assignment of Mortgage is to be recorded, the Mortgage shall be assigned to the Owner.  If the Assignment of Mortgage is not to be recorded, the Assignment of Mortgage shall be delivered in blank.  If the Mortgage Loan was acquired by the Owner in a merger, the Assignment of Mortgage must be made by "[Seller], successor by merger to [name of predecessor]".  If the Mortgage Loan was acquired or originated by the Owner while doing business under another name, the Assignment of Mortgage must be by "[Seller], formerly known as [previous name]";

(f)     the originals of all intervening assignments of mortgage (if any) evidencing a complete chain of assignment from the Originator to the Last Endorsee with evidence of recording thereon, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of mortgage, the Owner shall deliver or cause to be delivered to the Custodian, a photocopy of such intervening assignment, together with (i) in the case of a delay caused by the public recording office, a photocopy of such intervening assignment, together with an Officers Certificate of the Owner (or certified by the title company, escrow agent, or closing attorney) stating that such intervening assignment of mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening assignment of mortgage or a copy of such intervening assignment of mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage will be promptly delivered to the Custodian upon receipt thereof by the Owner; or (ii) in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(g)     The original mortgagee policy of title insurance or, in the event such original title policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company;

(h)     original powers of attorney, if applicable, or, if in connection with any Mortgage Loan, the Owner was unable to deliver or cause to be delivered the original power of attorney with evidence of recording thereon, if applicable, on or prior to the Transfer Date because of a delay caused by the public recording office, the Owner shall deliver or cause to be delivered to the Custodian, a photocopy of such power of attorney, together with an Officer's Certificate of the Owner (or certified by the title company, escrow agent, or closing attorney) stating that such power of

attorney has been dispatched to the appropriate public recording office for recordation and that the original recorded power of attorney or a copy of such power of attorney certified by such public recording office to be a true and complete copy of the original recorded power of attorney will be promptly delivered to the Custodian upon receipt thereof by the Owner; and

(i)  security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any.

The following documents, together with the Mortgage Loan Documents, shall constitute the Mortgage File with respect to each Mortgage Loan:

(a)  The hazard insurance policy and, if required by law, flood insurance policy.

(b)  Residential loan application.

(c)  Mortgage Loan closing statement.

(d)  Verification of employment and income except for Mortgage Loans originated under a Limited Documentation Program.

(e)  Verification of acceptable evidence of source and amount of downpayment.

(f)  Credit report on the Mortgagor.

(g)  Residential appraisal report, if available.

(h)  Photograph of the Mortgaged Property.

(i)  Survey of the Mortgaged Property, if any.

(j)  Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

(k)  All required disclosure statements.

(l)  If available, termite report, structural engineer's report, water potability and septic certification.

(m)  Sales contract, if applicable.

(n)  Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers

and records which are customarily contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

(o)      Amortization schedule, if applicable.

EXHIBIT E

TRANSFER INSTRUCTIONS - ATTACHED

EXHIBIT F

CUSTODIAL ACCOUNT CERTIFICATION

_____ __, ____

       [SERVICER] hereby certifies that it has established the account described below as a Custodial Account pursuant to Section 3.03 of the Servicing Agreement, dated as of _____, 2011 Residential Mortgage Loans and REO Properties.

Title of Account:     "_____ in trust for _____, owner of Residential Assets."

Account Number:     _____.

Address of office or branch of
the Servicer at which account
is maintained:

                              [SERVICER]
                              Servicer

                              By: _____
                              Name: _____

                              Title: _____

                              Date: _____

EXHIBIT G

ESCROW ACCOUNT CERTIFICATION

_____ ___, ____

        [SERVICER] hereby certifies that it has established the account described below as an Escrow Account pursuant to Section 3.05 of the Servicing Agreement, dated as of _____, 2011, Residential Mortgage Loans and REO Properties.

Title of Account:   "_____ in trust for _____, owner of Residential Assets, and various Mortgagors."

Account Number:   _____.

Address of office or branch of
the Servicer at which account
is maintained:

RESIDENTIAL CREDIT SOLUTIONS, INC.

Servicer

By: _____

Name:
Title:
Date: _____

EXHIBIT H

CONTENTS OF ASSET SCHEDULE

Servicer Loan Number
Alternative Loan Number
Borrower Name
Property Address
Property City
Property State
Property Zip
Original Loan Amount
Current Balance
Mortgage Loan/REO Flag
Current Mortgage Interest Rate
Date Interest Paid Through
Lien Position of Mortgage
Senior Lien Balance (where applicable)
Note Origination Date
First Payment Date
Original Term
Amortization Term
Maturity Date
MERS ID (where applicable)

EXHIBIT I

[RESERVED]

EXHIBIT J

MONTHLY REPORTING


The Servicer shall provide the following monthly reports to the Owner:

- RCS Investor Remittance report

- RCS Investor Reporting
    - Remittance
    - Trial balance
    - Loans Removed
    - Loans Added
    - Curtailment Report
    - Paid in Full Report
    - Advance Billing

EXHIBIT K
LIMITED POWER OF ATTORNEY

Owner hereby appoints Servicer, as their true and lawful attorney-in-fact, to act in their place for the following purposes:

To sign, execute, acknowledge, deliver and record, in the name of Owner, and any acquired or merged entities, all documents in conjunction with the Mortgage Loans for the purposes of (i) completing and recording any assignment, release or reconveyance instrument which is required for (a) the proper servicing of the related Mortgage Loan or otherwise necessary to cure any defect in the chain of title, (b) to ensure that the Mortgage Loan vests in the name of Owner or another party designated by Owner, and (c) for any transfer of record title which is required with respect to the Mortgage Loans or any security interest related thereto, (ii) curing any defects associated with any other document or instrument with respect to a Mortgage Loan related to the servicing thereof pursuant to the Agreement; (iii) pursuing, prosecuting and defending foreclosures (or other comparable conversions to ownership), ejectments, evictions, bankruptcies, suits and other related matters with respect to any Mortgaged Property, as defined in and pursuant to the Agreement; (iv) executing all deeds, tax declarations, certificates and any other documents or instruments necessary, appropriate or required to list, sell, transfer and assign any Mortgaged Property either by foreclosure or by deed lieu of foreclosure, with any such deed to be without recourse; (v) taking such further actions as are deemed necessary or required to service, administer and endorse the terms of the Mortgage Loans in accordance with the Agreement, including and without limitation, executing any subordination or release agreements; and (vi) endorsing checks, drafts and other evidences of payment made payable to Owner in conjunction with any Mortgage Loan, representing payments on accounts with all such amounts deposited in the Custodial Account or Escrow Account, as defined in and pursuant to the Agreement.

The undersigned gives to said attorney-in-fact full power and authority to execute such instruments and to perform all things requisite, necessary, and proper to carry into effect the powers granted by or under this Limited Power of Attorney as fully, to all intents and purposes, as the undersigned might or could do, as if the undersigned were personally present, hereby ratifying and confirming all that said attorney-in-fact shall lawfully do or cause to be done by authority hereof. This Limited Power of Attorney is subject to all the terms and conditions included in the Agreement and is effective as of the date hereof, and shall continue in full force and effect until revoked in writing by the undersigned.

Executed this _____ day of _____, 2011

EXHIBIT L

[RESERVED]

EXHIBIT M

EXCEPTIONS SCHEDULE

# EXHIBIT 2

**Erika Barbour**

| | |
|---|---|
| **From:** | Todd Knoll [TKnoll@residentialcredit.com] |
| **Sent:** | Monday, August 08, 2011 8:56 AM |
| **To:** | Derrell Riley |
| **Cc:** | Lisette Smyth; Andrea Lutchman |
| **Subject:** | RE: A-R-E Billing |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

They told me it will be looked at as soon as they can.

In the meantime, I would hold any payments until they can determine the total amount due.

---

**From:** Derrell Riley [mailto:driley@arenow.com]
**Sent:** Monday, August 08, 2011 10:00 AM
**To:** Todd Knoll
**Cc:** Lisette De Padua; Andrea Lutchman
**Subject:** RE: A-R-E Billing

Todd any word from Kelly and Rudy?

---

**From:** Todd Knoll [mailto:TKnoll@residentialcredit.com]
**Sent:** Friday, August 05, 2011 9:17 AM
**To:** Derrell Riley
**Cc:** Lisette De Padua; Andrea Lutchman
**Subject:** A-R-E Billing

Derrell – Wanted to give you a status update. Kelly and Rudy are meeting to review the findings of loan administration today and plan to be in contact on Monday of how they want to handle .

Part of what was reviewed is mentioned in several emails by Andrea to our investor accounting team.

I will let you know something as soon as I get new information.

Thanks.

Todd Knoll
Investor Relations Manager

 RCS    Residential Credit Solutions, Inc.

4282 North Frwy., Fort Worth, TX 76137
Office Main:  817-321-6124
Cell:  817-701-8845
Fax Direct:  817-321-6624